## T. & J. O'HANLON vs. PERRY.

The pre-emption law of July 9, 1332, was not continued in force by that of 1838. And a pre-emption certificate issued in 1839, and which purported to be under the act of July 9, 1832, is void upon its face.

**ERROR** to Washington Circuit Court.

ANDERSON, for Plaintiffs.

On behalf of the appellants it will be contended,

1st. That the instructions given by the court below at the instance of the plaintiff were wrong; tending to mislead the jury.

2d. That the instructions refused the defendants below should have been allowed.

3d. That the circuit court erred, in refusing to admit the evidence offered by the defendants, showing that the lands entered by John Perry on the 26th November, 1839, under the pre-emption act of congress of the 9th July, 1832, had never been offered for sale, and that said land was reserved by surveyor Ashley, 2 Dec'r. 1820, for certain purposes.

4th. That said court erred in refusing the defendants permission to prove that they resided upon, and cultivated said land, and claimed a right of pre-emption to the same, if they could be regarded as public lands liable to entry.

5th. That a new trial should have been granted for the reasons filed.

SCOTT & ZEIGLER, for Defendant.

1. That the certificate of the receiver, and the testimony given by Perry, was sufficient to authorize the finding and recovery. Revised Code of 1835, page 234, sec. 2.

2. That it was not competent for the defendants below, the O'Hanlons, to go behind, or impeach the title of Perry derived from the United States, on the ground of fraud, illegality or irregularity of the acts of the United States officers. 6 Mo. Rep. 106, Hunter vs. Hemphill.

3. That it was not competent for the O'Hanlons to show as matter of defence, on a trial in an action of ejectment, that they were entitled to the right of pre-emption, because our State courts have no power to decide that question, as it would amount to an interference in the primary disposition of the soil, against the compact of the State with the United States. State Constitution, Revised Code of 1835, page 25, article 9, section 1.

4. That the O'Hanlons entirely failed to prove the custom on which they pretended to rely, as matter of defence: but if proved, it was no defence in this action of ejectment: but if admissible as a defence and proved, the jury have passed on, and by their verdict negatived that part of their defence. Customs, how proved, 1 Bla. Com. 76-7; 2 Ib. 31.

5. That the instructions given by the court for Perry, were rightfully given.  6 Mo. Rep. 106, Hunter vs. Hemphill.

6. That the instructions refused to be given by the court for the O'-Hanlons, were rightfully refused, and the testimony offered and rejected, rightfully rejected.  1 Mo. Rep. 97, Coleman v. Roberts; 1 do. do. 505, Donahoe v. Glasgow; 1 do. do. 318, Bellissine v. McCoy; 1 do. do. 662, Russell v. Barcroft; 3 do. do. 382, Hines v. McKiney; 3 do. do. 411, Williams v. Harrison; 6 do. do. 6, Nicholas v. State; 6 do. do. 279, Newman v. Lawless.

NAPTON, J., delivered the opinion of the court.

This was an action of ejectment brought by Perry against the O'Hanlons, to recover a tract of land in Washington.  The plaintiff had a verdict and judgment in the circuit court.

The evidence offered on the trial by Perry to sustain his action, consisted of the receipt of the receiver at Jackson, for the land in controversy, (about 563 acres,) issued under and by virtue of the pre-emption act of the 9th July, 1832, and proof that defendants were in possession of a part of the premises.

The defendants offered proof conducing to show, that the tract of land in controversy was part of a tract known in former times as the *Citadel tract*, and made by an off-set in the survey of a larger tract, called the *Austin tract;* that John Perry had claimed this land since 1808; had furnaces erected thereon, and cultivated a field, in the tract, but that the community at large, notwithstanding this claim, continued to dig for mineral on the land; that prior to 1803, portions of the land were staked out into lots, without any enclosures or buildings thereon; that defendants had lived on the land for twelve years; that John Perry and the United States agents first set up exclusive title in 1827.

The defendants further offered to prove, that Perry claimed from one Basil Valle, by a conveyance executed in 1806; that said conveyance includes his house and lot in Mine a Breton, and that under this conveyance, Perry had procured a confirmation of his aforesaid lot, and an out-lot, containing about ten acres.  This was offered to be proved by the certificate of the auditor of public accounts, sent to the clerk of Washington county.

The defendant offered further to prove, that Perry was not a housekeeper on the land, so entered at the land office at Jackson.

They offered also to prove, that Perry could not have any donation or settlement right under said Basil Valle, because said Valle had a

concession from the Spanish government, which had been confirmed; and for that purpose read the extract from the books of the recorder of land titles, containing the proceedings of the last board on the *Old Mine concession*.

The defendants further offered to prove that they had filed with the register and receiver at Jackson, a notice of their right, before the land was offered for sale; that they offered to prove up their pre-emption, and tendered payment for the land, but that the same was refused; and they offered *then* to prove that they were entitled to a pre-emption. This evidence was rejected.

They also offered to prove that Perry's entry was illegal; that they had appealed to the commissioner of the general land office, and that the matter was pending, and undetermined in that office.

The circuit court instructed the jury, that the certificate given in evidence was *prima facie* evidence of title; that the regularity of the acts of the officers who sold the land, was not a matter of enquiry in this action, and that the plaintiff must recover, unless the defendants had a better title themselves, or proved a better outstanding title in another.

The defendants asked the court to declare the law to be, that the act of congress of March 2, 1833, does not continue in force the operation of the act of July 9th, 1832, so far as the pre-emptions under the last named act are concerned, any longer than the act of 1832 *per se* does; and that the pre-emption act of 1838, does not revive the act of July 9, 1832, or its provisions in relation to special pre-emptions.

These instructions were refused.

This case is presented in a shape which does not admit of a decision on the absolute merits of Perry's title. The court having excluded all evidence attacking or impugning the plaintiff's title, he was of course not called upon to sustain it, and a reversal of the judgment does not therefore necessarily imply the nullity of the plaintiff's title.

From the testimony which the defendant offered to introduce, and from that which he did introduce, it may be inferred that he desired and intended to prove,

*First*, That Perry was not a housekeeper on the land entered, and therefore not within the pre-emption clause of the act of Congress of 9th July, 1832.

*Second*, That the defendants were entitled to a pre-emption.

*Third*, That John Perry had no claim, the rejection of which would bring him within the proviso of the third section of the act of 1832; and,

*Fourth,* That the act of 1832 had expired, when Perry obtained his pre-emption under it, and that the act of 1838 did not revive it.

The first two propositions may be considered together; and I regard them as involving the same questions, which the court determined in the case of Lewis vs. Lewis. If a court of chancery cannot try disputed rights to pre-emptions, under the acts of congress *a fortiori,* it is without the province of a court of law to investigate such questions in an action of ejectment.

The proof offered on this head was, that defendants were entitled to a pre-emption, and the plaintiff was not. Can this court, or any other court, reverse the decision of the register and receiver, and give title to the defendants upon their making satisfactory proof of a right to pre-emption? The United States, the proprietor of these lands, have declared that the right to a preference in the purchase of their lands, shall be determined by certain officers selected by them, and that such right shall be proved to the satisfaction of such officers. Will it then answer to prove it to the satisfaction of this court?

This language of the acts of Congress granting pre-emptions, is obviously the result of deliberate caution, and its continued adoption, without the slightest change, from 1814 up to the passage of the last law on the subject, indicates the importance attached to it by Congress. Their action on this matter seems to be the result of a conviction that the officers to whom the sale of the public domain is entrusted, are as likely to do justice to claimants, as the State or federal courts. At all events, as the proprietor of the land, the United States had a right to prescribe the terms upon which they would sell. Individual instances of injustice and oppression may happen under such a law, but perhaps such cases are not more likely to happen as the law now is, than if an appeal from the decision of these officers was given to the courts.

A confirmation by act of Congress is not at all analogous to the privilege granted by a pre-emption law. The former conveys the title of the United States as effectually as a patent; the latter professes to give no title, not even the lowest order of title, but merely a priority of right in the acquisition of title. The first is a title, the latter is a mere privilege. If the officers, whose duty it is to take cognizance of this privilege, neglect that duty, I know of no power in the State courts to compel them. Their mistakes or frauds may be corrected by the department at the seat of the federal government; and this appears to be the only corrective where there is a wilful, or a mistaken breach of duty by the subordinate officers, who conduct the sale of the public lands.

Where conflicting titles have emanated from the government, of course the courts must decide between them; but they cannot create a title in an individual, where the United States have not given any. During the existence of the pre-emption laws from 1830 to 1838, the courts might very well protect the settler in his possession, until the expiration of the time allowed him to acquire title; not because he derived any title from such laws, but because a title could not emanate during the existence of his pre-emption, to any other than himself, which would be valid until the expiration of that time, and his failure to avail himself of his privilege. But where the time has expired, and no title has been acquired, though his failure to procure a title may have been owing to the improper and illegal conduct of the officers, he is no longer within the protection of the law, and he undoubtedly no longer has any title which can be recognized in an action of ejectment.

The case of Stephenson vs. Smith is not inconsistent with these principles; that was a question of fraud in the person acquiring the legal title, whom the court therefore considered a trustee for the equitable owner.

The court, in my opinion, did not err in refusing to permit the O'Hanlons to prove up their right of pre-emption; for the same reason, the proof of the want of certain pre-requisites, among others that Perry was not a house-keeper on the land, was properly rejected. The officers, who permitted the entry, decided otherwise, and it was a question of fact for their determination.

The defendant also offered to prove that the plaintiff had no claim, in consequence of which the land in controversy had been reserved from sale. If so, he was not within the provisions of the act of 1832.

The testimony in relation to Basil Valle's claim under the *old mine* concession, and Perry's claim under Valle was introduced, as I suppose, for the purpose of showing that Perry had no claim to the 553 acres which he entered at the land office; that this land had been in fact reserved for some other purpose, or on account of some other claim. The same purpose seems designed by the evidence of Perry's confirmation to the lot, and out-lot in Mine a Breton. The relevancy of this evidence is exceedingly obscure, to say the least of it, and I am not satisfied that the question is one which could be enquired into. The register and receiver in granting the pre-emption, had necessarily to pass upon these questions. Under the act of the 9th July, 1832, it was made the duty of the recorder and commissioners to transmit to the register of each land office, monthly abstracts of relinquishments of

claims in his district, showing the date of the claim, the names of the present and original claimants, the quantity of the claim, and its designation by section, township and range. Those returns would show much more satisfactorily than such negative evidence as the defendants attempted to introduce, whether the register acted in conformity to law in these particulars. It is clear, that if there was no such claim on the part of the plaintiff, he did not come within the provisions of the law. But, however this may be, the last objection raised by the defendant's instructions, was I think available.

The proviso of the 3d section of the act of July 9, 1832, was a special pre-emption law; it provided that actual settlers, being housekeepers, upon such lands as are rejected, claiming to hold under such rejected claim, or such as may waive their grant, shall have the right of pre-emption to enter, within the time of the existence of this act, not exceeding the quanty of their claims. This provision allowed the claimants two years from the date of the organization of the board, to enter the land claimed. The pre-emption act of 1838, had no relation to this act; the terms upon which pre-emptions were allowed, and the amount of land allowed the settler, differed most materially from the provisions of the act of 1832. Perry entered the land in controversy under the act of 1832, on the 26th Nov., 1839, several years after the expiration of the law. The entry, on *its face*, purports to be made by virtue of the pre-emption act of 1832, and purports to have been made on the 26th Nov., 1839. It is, therefore, *prima facie*, made without any authority. This is a question of law, which the courts can determine, and not a question of fact, passed upon by the receiver and register. In such a case the presumption which usually arises that the pre-requisites of the law have been complied with, cannot be indulged; for the certificate carries on its face the marks of illegality. It is apparent that it was issued at a time when the officers had no power or authority to issue such a certificate, and it is not therefore *prima facie* evidence even against a mere occupant.

I admit that the United States may disregard the illegality of the certificate, and ultimately give the title by patent to the plaintiff; but so long as the plaintiff has no other evidence of his title than this certificate it is, in my opinion, insufficient to maintain his action.

I think the judgment should be reversed.