JOSEPHINE KOFKA, APPELLANT, V. JOHN ROSICKY ET
AL., APPELLEES.

FILED JUNE 26, 1894.    No. 4927.

1. **Specific performance of a parol contract** will be en-
   forced by a court of equity, where one party has wholly and
   the other partly performed it, and its non-fulfillment on the one
   hand would amount to a fraud on the party who has fully per-
   formed it.

2. **Specific performance is a matter of discretion** in a court
   which withholds or grants relief according to the circumstances
   of each particular case, where the general rules and principles
   governing the court do not furnish any exact measure of justice
   between the parties.

3. **Specific Performance.**    *Held,* That the oral contract in this
   case possessed the elements of certainty, and the proof estab-
   lishing it was sufficiently clear and satisfactory.

4. **Wills:** PAROL CONTRACTS: ACTION BY ADOPTED CHILD FOR
   SPECIFIC PERFORMANCE: STATUTE OF FRAUDS.    A girl about
   seventeen months old was given by her parents to her uncle and
   aunt under an agreement that they would adopt her and rear,
   nurture, and educate her, and that she was to be as their own

child, and at their death to receive, or be left, all the property which they might own. She lived with them until they died, some ten years afterward, took their name, did not recognize or know her own father and mother in the true relation, but knew them as and called them uncle and aunt, and knew and recognized her uncle and aunt as father and mother. The uncle and aunt died possessed of real estate in the city of Omaha, the title to which they did not, either by deed or will, transfer to the child. *Held*, That there was such a part performance of the contract by the parties thereto as entitled her to a decree giving her the title to the property, by way of specific performance of the contract.

APPEAL from the district court of Douglas county. Heard below before WAKELEY, J.

The opinion contains a statement of the case.

*Switzler & McIntosh*, for appellant:

The agreement, although not in writing, is such as a court of equity will enforce. (*Briton v. Van Cott*, 33 Pac. Rep. [Utah], 218; *Korminsky v. Korminsky*, 21 N. Y. Supp., 611; *Godine v. Kidd*, 64 Hun [N. Y.], 585; *Van Dyne v. Vreeland*, 11 N. J. Eq., 370; *Sharkey v. McDermott*, 91 Mo., 655; *Wright v. Tinsley*, 30 Mo., 389; *Gupton v. Gupton*, 47 Mo., 37; *Sutton v. Hayden*, 62 Mo., 101; *Hill v. Gomme*, 1 Beav. [Eng. Ch.], 555; *Wall's Appeal*, 111 Pa. St., 460; *Thompson v. Stevens*, 71 Pa. St., 161; *Pollock v. Ray*, 85 Pa. St., 428; *Taft v. Taft*, 41 N. W. Rep. [Mich.], 481; *Slingerland v. Slingerland*, 39 N. W. Rep. [Minn.], 146; *Welch v. Whelpley*, 28 N. W. Rep. [Mich.], 744; *Twiss v. George*, 33 Mich., 253; *Shamp v. Meyer*, 20 Neb., 223; *Dawson v. McFaddin*, 22 Neb., 131; *Franklin v. Tuckerman*, 27 N. W. Rep. [Ia.], 759; *Carmichael v. Carmichael*, 40 N. W. Rep. [Mich.], 176; *Faxton v. Faxon*, 28 Mich., 159; *Sword v. Keith*, 31 Mich., 247; *De Moss v. Robinson*, 46 Mich., 62; *Mundy v. Foster*, 31 Mich., 313; *Johnson v. Hubbell*, 10 N. J. Eq., 332; *Sample v. Collins*, 46 N. W. Rep. [Ia.], 742; *Brown v. Hoag*, 29 N. W. Rep.

[Minn.], 135; *Ford v. Steele,* 31 Neb., 521; *Winans v. Luppie,* 47 N. J. Eq., 302.)

The contract of adoption is not within the statute of frauds. (*McCormick v. Drummett,* 9 Neb., 388; *Taylor v. Deseve,* 16 S. W. Rep. [Tex.], 1008; Comp. Stats., secs. 4, 6, ch. 32; *Wallace v. Rappleye,* 103 Ill., 231.)

*Mahoney, Minahan & Smyth, contra:*

Under the alleged agreement it was the duty of the Spilineks to legally adopt, educate, and treat plaintiff as their own child, and leave her all their property at their death.   If the court cannot decree the performance of the whole contract, it will not enforce any part of it. (*Thayer v. Rock,* 13 Wend. [N. Y.], 53; *Pond v. Sheean,* 23 N. E. Rep. [Ill.], 1018; *Meyers v. Shemp,* 67 Ill., 471; *Prante v. Schutte,* 18 Brad. [Ill.], 62; *Hall v. Loomis,* 30 N. W. Rep. [Mich.], 374; Waterman, Specific Performance of Contracts, sec. 389; *Nickels v. Hancock,* 7 De G., M. & G. [Eng.], 300; *South Wales R. Co. v. Wythes,* 1 K. & J. [Eng.], 186.)

The plaintiff was not adopted by the Spilineks according to statute.   Neither was there any attempt to follow the provisions of our Code.   The law of adoption was not and is not a part of the common law.   It is purely statutory.   Where the statute points out the way in which a thing shall be done, that is the only way in which it may be done.   The plaintiff was not legally adopted. (Code of Civil Procedure, secs. 796–800; *Tecumseh Town Site Case,* 3 Neb., 284; *Keith v. Tilford,* 12 Neb., 273; *Shearer v. Weaver,* 56 Ia., 578; *Houx v. Bates County,* 61 Mo., 391.)

A court of equity cannot specifically enforce that part of the contract which imposes upon the Spilineks the duty of legally adopting the plaintiff. (*Shearer v. Weaver,* 56 Ia., 578; Story, Equity Jurisprudence, secs. 96, 177; *Long v. Hewitt,* 44 Ia., 363; *Houx v. Bates County,* 61 Mo., 391; Schouler, Domestic Relations, 232.)

The court will not specifically enforce any contract, whether it be oral or written, until the following elements appear therein : Valuable consideration, certainty as to its subject-matter, its stipulations, its fairness, its parties, and the circumstances under which it was made. It must be mutual. It must be perfectly fair, equal, and just in its terms and in its circumstances. (*Minturn v. Seymour*, 4 Johns. Ch. [N. Y.], 497; *Butman v. Porter*, 100 Mass., 337; *Nichols v. Williams*, 22 N. J. Eq., 63; *Rogers v. Saunders*, 16 Me., 92; *Benedict v. Lynch*, 1 Johns. Ch. [N. Y.], 370; *Willard v. Taylor*, 8 Wall. [U. S.], 557; *Woods v. Farmare*, 10 Watts [Pa.], 203.)

The alleged contract is not certain either in its subject-matter, its purposes, or the circumstances under which it was made. (*Hennessy v. Woolworth*, 128 U. S., 438; *Purcell v. Miner*, 4 Wall. [U. S.], 517; *Nickerson v. Nickerson*, 127 U. S., 668; Browne, Statute of Frauds, secs. 487, 491; *Walepole v. Oxford*, 3 Ves. [Eng.], 419; *Askew v. Carr*, 8 S. E. Rep. [Ga.], 74; *Gallagher v. Gallagher*, 5 S. E. Rep. [W.Va.], 297; Story, Equity Jurisprudence, sec. 764; *Gorham v. Dodge*, 14 N. E. Rep. [Ill.], 44; *Brix v. Ott*, 101 Ill., 70; *Hamilton v. Harvey*, 121 Ill., 469; *Magee v. Mc-Manus*, 12 Pac. Rep. [Cal.], 451; *Lanz v. McLaughlin*, 14 Minn., 72; *Miller v. Zufall*, 6 Atl. Rep. [Pa.], 350; *Brown v. Brown*, 47 Mich., 384; *Recknagle v. Schmalz*, 33 N. W. Rep. [Ia.], 365.)

The alleged contract is not mutual. (Waterman, Specific Performance of Contracts, sec. 196; *Iron Age Publishing Co. v. Western Union Telegraph Co.*, 3 So. Rep. [Ala.], 449; *Cooper v. Pena*, 21 Cal., 404; *Webb v. Alton Marine & Fire Ins. Co.*, 5 Gil. [Ill.], 225; *Wallace v. Rappleye*, 103 Ill., 229.)

The contract is not fair, equal, and just. (*Jackson v. Ashton*, 11 Pet. [U. S.], 229; *Osgood v. Franklin*, 2 Johns. Ch. [N. Y.], 1; *Walpole v. Oxford*, 3 Ves. [Eng.], 419.)

The contract has not been taken out of the statute of frauds. (*Morgan v. Bergen*, 3 Neb., 209; *Baker v. Wiswell*, 17 Neb., 58; *Poland v. O'Connor*, 1 Neb., 53; *Dawson v. McFaddin*, 22 Neb., 131; *Neale v. Neales*, 9 Wall. [U. S.], 1.)

Plaintiff has not paid anything in pursuance of the contract. Assume that her affection, obedience, and services, if there were any, would take the place of payment; still that would not hold, because by the terms of the contract she was not required to do those things. (*Horn v. Ludington*, 32 Wis., 73; *Morgan v. Bergen*, 3 Neb., 209.)

Possession must be obtained under the agreement and in part performance of it to take the case out of the statute of frauds. (*Moore v. Small*, 7 Harris [Pa.], 468; *Cronk v. Trumble*, 66 Ill., 428; *Wood v. Thornly*, 58 Ill., 464; *Padfield v. Padfield*, 92 Ill., 198; *Hart v. Carroll*, 85 Pa. St., 508; *Ballard v. Ward*, 89 Pa. St., 358; *Miller v. Zufall*, 6 Atl. Rep. [Pa.], 350; *Ferbrache v. Ferbrache*, 110 Ill., 210; *Kaufman v. Cook*, 114 Ill., 11; *Clark v. Clark*, 122 Ill., 388; *Wallace v. Long*, 5 N. E. Rep. [Ind.], 666; *Pond v. Sheean*, 23 N. E. Rep. [Ill.], 1018.)

The plaintiff is not entitled to performance on the ground of equitable fraud. (3 Pomeroy, Equity Jurisprudence, sec. 1409, note 2; *Morgan v. Bergen*, 3 Neb., 209; *Parkhurst v. Van Cortlandt*, 1 Johns. Ch. [N. Y.], 273; *Pierce v. Catron*, 23 Gratt. [Va.], 588; *Pond v. Sheean*, 23 N. E. Rep. [Ill.], 1018; *Gallagher v. Gallagher*, 5 S. E. Rep. [W. Va.], 297; Waterman, Specific Performance of Contracts, secs. 263, 268; *Wheeler v. Reynolds*, 66 N. Y., 227.)

*Lamb, Ricketts & Wilson*, amici curiæ, contending that the contract under consideration is in nowise affected by the operation of the statute of frauds, cited: *Powder River Live Stock Co. v. Lamb*, 38 Neb., 339; *McCormick v. Drummett*, 9 Neb., 388; *Connolly v. Giddings*, 24 Neb., 131; *Kiene v. Shaeffing*, 33 Neb., 21; *Stowers v. Hollis*, 83 Ky.,

544; *Wooldridge v. Stern*, 42 Fed. Rep., 311; *Hall v. Solomon*, 23 Atl. Rep. [Conn.], 876; *Taylor v. Deseve*, 16 S. W. Rep. [Tex.], 1008; *Thomas v. Armstrong*, 10 S. E. Rep. [Va.], 6; *Aiken v. Nogle*, 27 Pac. Rep. [Kan.], 825; Browne, Statute of Frauds [4th ed.], 275–285, and authorities cited; *Stadleman v. Fitzgerald*, 14 Neb., 292.

HARRISON, J.

December 8, 1888, the following petition was filed in the district court of Douglas county.

"The plaintiff, Josephine Kofka, appears by her next friend, James Kofka, and for her cause of action alleges the fact to be that this plaintiff was born in Omaha, Nebraska, on the 16th day of March, 1877; that her father's name is James Kofka, who appears here as her next friend, and her mother's name is Mary Kofka, both of whom were then residing in Omaha, and have ever since here resided; that the parties to this suit are all of Bohemian nationality; that soon after her birth, to-wit, in the month of August, 1878, there were living in Omaha, John Spilinek, deceased, and his wife, Anna Spilinek, the latter being a sister of the plaintiff's mother. During said month the said John Spilinek and Anna Spilinek, who never had any children of their own, requested of plaintiff's parents the privilege of taking this plaintiff with them to live with them as their child. The parents of plaintiff having several children, one of whom at that time was only a few weeks old, fully considered the matter, and having full confidence that plaintiff would receive at the hands of John and Anna Spilinek the care and affection which is due from parents to child, consented to said request, but only upon the expressed and well understood conditions, to be hereinafter named; that is to say, James Kofka and Mary Kofka, the parents of the plaintiff, gave up the care, custody, and control of said child, in the said month of August, 1878, on the consideration and agreement, then and there assented

to by the said John and Anna Spilinek, that they would legally adopt and receive the said child as their own, would care for her, rear and educate her, and that she should have their fullest and best affection, and at their death she, the plaintiff, should inherit and be left all the property with which they died possessed.

"Plaintiff further says that she went to live with the said John and Anna Spilinek at the time above mentioned, on the terms aforesaid; that she continued to live uninter-ruptedly with them until their death, which came to John Spilinek on September 16, 1888, and to Anna Spilinek on September 19, 1888. The plaintiff says that during all of said time she conducted herself toward the said Spilineks as an affectionate and obedient child and received at their hands all the devotion and love a child should receive from parents; that she had, for several years previous to their death, assisted her aunt, Anna Spilinek, in the work about the house, in the way of washing, making up the beds, house cleaning, going on errands, and generally doing at their request anything within her power; that she has of late years been going to the public schools of the city of Omaha, where she was always enrolled and known as Josephine Spilinek, and, in fact, she has always gone by that name, and never knew any other until the death of the said John and Anna Spilinek. Plaintiff says the said John and Anna Spilinek always called her their own child, and so treated her, and she was told and given to under-stand by them that her own father was her uncle and her own mother her aunt, and she knew not the contrary until after September 19, 1888, and she always believed, and in her own mind cannot but believe yet, that the said John and Anna Spilinek were her real father and mother.

"The plaintiff further says that the said deceased, John Spilinek and Anna Spilinek, often, during the last ten years, expressed and made known to friends and acquaint-ances, and to the plaintiff's parents, their intention to leave

this plaintiff all their property at their death, and these promises and declarations on the part of both were made up to and within a few days of and on the very day of their death, and plaintiff says that up to the very time of their death they intended to leave their property to this plaintiff; that the said deceased always intended to fulfill their agreement of adoption by legal proceedings according to the statutes, but all parties concerned were on intimate and friendly terms, and the matter was allowed to go by, all feeling secure, and that for all intents and purposes plaintiff was as fully their child as if the formalities had been gone through, until it was finally prevented by his sudden death as hereinafter mentioned.

"Plaintiff further says that on the 16th day of September, 1888, the deceased John Spilinek was suddenly overtaken by a loss of control of his mental faculties and while thus afflicted shot himself dead, and inflicted mortal wounds at the same time upon his said wife; that John Spilinek died within a short time on the same day, but his said wife Anna lingered until September 19, 1888, when she died from the effects of said wounds. Plaintiff says there was no marital or family difficulty whatever to induce this conduct on the part of said John Spilinek, but it was wholly caused by despondency brought on by fancied business embarrassments.

"Plaintiff says that the deceased John Spilinek died intestate, but had it not been for his sudden act of suicide, he would have made provision by will for his property to go to his wife during her life, and at her death, to this plaintiff, as was his oft-expressed desire and intention up to the very time of his death.

"Plaintiff alleges that Anna Spilinek, deceased, while in the full and complete control of her mental faculties, and recalling her deceased husband's desire in the premises as well as their agreement, did on September 17, 1888, make and execute a will in writing, which said will was duly

probated and allowed on the 20th day of November, A. D.
1888, by the terms of which all the real and other prop-
erty of which she died possessed, subject to two or three
small debts, was left to this plaintiff, whom she calls
therein, 'our adopted child, Josepha Kofka.' The fol-
lowing is a copy of said will:

"'LAST WILL OF

"'I, Anna Spilinek, of Douglas county and state of
Nebraska, being aware of the uncertainty of life, but of
sound mind and memory, do make and declare this to be
my last will and testament in manner following, to-wit: I
give, devise, and bequeath unto our adopted child, Josepha
Kofka, all of mine real estate, money, personal property,
and other effects that I may be possessed of or entitled to
after my decease, subject, however, to all my legal debts;
that is to say, I and my husband owe to Karel Spilinek
$150, and to John Barta $50, and to Barbara Spilinek $9.
I also further declare that out of the above real estate and
money $100 be set and given to my father, Frank Radil.
Signed this 17th day of September, 1888, at Omaha, Ne-
braska.                    .          Anna Spilinek.

"'Signed in the presence of
    "'James Engelthale.
    "'Frank Mrkwicka.
    "'Vaclav Benak.'

"The plaintiff says that the defendant John Rosicky is
the duly appointed, qualified, and acting administrator of
the estate of the said John Spilinek; that the other defend-
ants named, to-wit, Anton Spilinek, Frank Spilinek, Vin-
cent Spilinek and Albert Spilinek, being of ages respect-
ively fifty-three, fifty-one, forty-nine, and forty-two years,
are brothers of said John Spilinek, deceased; that they are
all non-resident aliens living at Skuhrov, Bohemia, except
Anton, and he is a resident and citizen of Nebraska.

"Plaintiff alleges that the defendant Anton Spilinek
claims to be the sole heir at law of the estate of John

Spilinek, his brothers being non-resident aliens, and disputes the right of this plaintiff to inherit any property whatever from the estate of the said John Spilinek, and he claims to be the sole heir to the real estate mentioned herein, and maintains that this plaintiff has no rights in the premises. The other brothers are made defendants in this case and brought into court out of caution, in view of our present law with respect to non-resident aliens.

" The plaintiff says that at the time of his death the deceased John Spilinek was possessed of the following real estate, situated in the city of Omaha, of the value of about $6,500; that is to say : The east half of lot 4, in block 11, and the east half of the west half of lot 4, in said block 11, S. E. Rogers' addition to Omaha, Nebraska. The defendant Herman Tombrinck claims a mortgage on the property described herein for $600, bearing date May 4, 1887, which appears of record in Douglas county as a lien on said property, but whether the same is genuine or unpaid this plaintiff has no information, and in order to put said Herman Tombrinck to his proof in the premises, she denies said mortgage is *bona fide* and valid lien on said property.

" The plaintiff says that since she and her parents have fully performed the agreement herein mentioned on their part, whereby they yielded the possession of and control over this plaintiff to said deceased parties, and she yielded to them the obedience, services, and devotion of a child for over ten years, and would have continued so to do but for their death, and that by their own acts during their lives she knew no other mother or father save them, and that whereas these decedents fully expected and intended she should inherit their property at their death, plaintiff says it would be a fraud on her and on them to have their agreements in that particular violated. The plaintiff therefore brings her cause before this honorable court on its equity side and prays that she may be decreed a specific perform-

ance of the contract mentioned herein and that she be declared to be the lawfully adopted child of the deceased John and Anna Spilinek; that she may be declared the legal heir to the property described herein, and all other property of said deceased, and to hold the same free from any claim or right the other defendants may have or claim in or to the same, and for such further relief in the premises as the facts in the case may entitle her."

We copy the allegations of the petition entire, for the reason that it is probably as short and complete a statement of the plaintiff's cause of action as can be made and fully set forth the same. A demurrer to the petition was filed, argued, and overruled, and the answer, filed by defendant March 7, 1890, which joined the issues upon which the case was tried and determined, contained two counts, the first of which was as follows:

"Now comes the said defendants, John Rosicky, administrator, Anton Spilinek, Frank Spilinek, Albert Spilinek, Vincent Spilinek, and answering for themselves only, deny each and every allegation in the petition filed in said cause except those expressly admitted herein.

"Defendants admit that plaintiff was born in Omaha, Nebraska; that her father's name was James Kofka and her mother's name Mary Kofka, and that both of them were residing in Omaha when the said plaintiff was born; that the parties to this suit are of Bohemian nationality; that the said plaintiff lived with the said John Spilinek, deceased, for some years; that in 1878 John Spilinek and his wife, Anna Spilinek, a sister of plaintiff's mother, resided in Omaha; that said John Spilinek and Anna Spilinek never had any children of their own; that plaintiff resided with the said John Spilinek and Anna Spilinek at the time of their death, and that John Spilinek died on September 16, 1888, and Anna Spilinek on the 19th day of September, 1888; that the said plaintiff has of late years attended the public schools of the city of

Omaha; that on the 16th day of September, 1888, the deceased, John Spilinek, was afflicted by a loss of control of his mental faculties, and while thus afflicted, shot himself dead, and inflicted a mortal wound at the same time upon his said wife; that the said Spilinek in a short time died and his said wife lingered until September 19, when she died from the effects of said wound; that there was no marital or domestic difficulty whatever to induce this conduct on the part of the said James Spilinek, but was wholly brought on by fancied business embarrassments; the deceased died intestate; that the will, a copy of which is set out in the petition, was signed by Anna Spilinek; that the defendant John Rosicky is the administrator of the estate of said John Spilinek, as alleged in the petition; that the other defendants, Anton Spilinek, Frank Spilinek, Albert Spilinek, and Vincent Spilinek, are brothers of the deceased, as set out in the petition; said brothers are all non-residents, except Anton Spilinek, and that he is a resident of the state of Nebraska; that said Anton Spilinek claims to be the sole heir at law of the estate of John Spilinek, and denies the right of the plaintiff to inherit any property whatever from the estate of the said John Spilinek, and he claims to be the sole heir to the real estate mentioned herein, and maintains that said plaintiff has no right to the premises; that the deceased, John Spilinek, was possessed of the real estate described in the petition at the time of his death, and that the defendant claims a mortgage upon said premises, as alleged in said petition.

"Further answering defendants say that they have no knowledge or belief concerning the date of plaintiff's birth, nor concerning the allegation that she continued to live on uninterruptedly with the said deceased until their death; nor that she conducted herself toward the said deceased as an affectionate and obedient child and received from the hands of the deceased all the love and devotion that she should receive from her parents; nor that she had, for sev-

eral years previous to the death of the deceased, assisted in
the work about the house as alleged in said petition; nor
that she was enrolled in the public schools as Josephine
Spilinek, and that she was always known by that name
and never knew any other until the death of the deceased;
nor that said deceased called her their child."

The second count of the answer pleads the statute of
frauds. The trial of the case, as regards the rights of the
plaintiff, was had July 17, 1891, and the issues were de-
termined in favor of defendants and the action of plaintiff
dismissed, and the case brought to this court on appeal by
plaintiff.

The evidence in this case discloses that the mother of
the plaintiff, Mary Kofka, was the sister of Mrs. Spilinek;
that they were living near each other in the city of Omaha,
with their husbands, John Kofka and John Spilinek. The
Kofkas were the happy possessors, at the time (August,
1878) when it is alleged the transaction occurred between
them out of which this suit springs or to which we may
refer as its source, of four children, among them the plaintiff,
then about seventeen months old. The Spilineks had no
children, and it was agreed between the parties that the
plaintiff should be taken by the Spilineks, to be reared,
educated, and cared for as if she was their own daughter,—
they stating that any property they might have or own
during life should be given to her, or be hers, at their
death, and that they would adopt her and make her their
heir. Pursuant to this agreement the plaintiff was taken
to the house of the Spilineks, who, at the time of these
occurrences, were poor, and, as appears from the testimony,
living in a shanty in the street. The plaintiff, from this
time until the death of the Spilineks,—of whom John
Spilinek died September 16, 1888, having on that day shot
first his wife and then himself, he dying immediately and
she two or three days later,—lived with the Spilineks and
was taught to and did call them father and mother and

treated them as such, and did not know her own father and mother, although she saw them almost, and possibly, every day, but accepted them as, and considered and called them, aunt and uncle, knowing no better, yet she went to the premises where they resided and played with their other children, thinking they were her cousins and treating them as such; that she did not know but what the Spilineks were her parents until after their death, when she was so informed by her mother and other parties.  The plaintiff was known at school as "Josie," or "Josephine Spilinek," and so wrote her name at all times after she learned to write.  In fact there seems to have been a complete loss of her identity, personality, or individuality as a Kofka, and an assumption of the Spilinek, as much so, apparently, as if her whole being, both mental and physical, had been changed.  The evidence further shows that she was a good, obedient, and dutiful child to the Spilineks, and also that they treated her well and affectionately.  At all times, in all places, and under all circumstances, Spilinek and his wife treated, looked upon, claimed, and acknowledged the plaintiff as their "child" or "girl."  The Kofkas, on their part, never made any claim to her or her services, or attempted to take her from the Spilineks, or by word or deed to inform her that they bore any other relation to her than that of uncle and aunt; and through all this was interwoven, as a part of the life and vitality of the agreement, the proposition that the plaintiff was to have the property.  It was always spoken of when the matter was mentioned between them, which was very frequently, and the Spilineks made it a subject of conversation with a number of persons, friends, and acquaintances, some of whom were called and so testified; and in a letter written by Spilinek, September 12, we find reference made to "my girl," which must be taken to mean the plaintiff, and in the will of Mrs. Spilinek, made just prior to her death, she fully recognized the position and rights of the plaintiff.

We are satisfied, after a careful examination, comparison, and analysis of all the testimony in the record, that the contract was one clear and definite in its terms and obligations, and was both made and performed as such with reference to the property rights to accrue or inure to or in favor of plaintiff as much as with reference to any other portion of it.

The Spilineks had acquired some property, a piece of real estate, the title to which is now in controversy in this case, for which, according to the evidence, Spilinek was at one time offered $4,000. There was also an agreement to adopt the plaintiff, or at least so the parties testify, and the parents and Spilineks often conversed about "assigning" her, but it does not seem to have been considered by them as one of the essentials of the compact, and which must necessarily be accomplished, but as something more of a formal nature, or character; nor do we think it was so inseparably connected with the other part of the contract as to. carry it along with it and render it incapable of enforcement, if so capable in any event, provided the agreement to. adopt cannot be decreed to be performed, which we think unquestionably it cannot be, as in this state the matter of adoption is statutory, and the manner of procedure and terms are all specifically prescribed and must be followed, and involve a written consent by the parties, a relinquishment by those possessing the rights to and over the child, and an acceptance by the person or persons desiring to acquire such rights and a decree by the judge of the county court, which introduces an element barring the jurisdiction of a court to decree specific performance in the first instance.

Having reached the conclusion that a contract was entered into, the query now arises, was it one of which a court of equity can and will decree a specific performance? The property which the plaintiff seeks to recover is real estate, and it is contended that the contract, resting entirely

in parol, is within the statute of frauds and hence cannot be enforced. Courts in the past (whether such action was wise or unwise we will not now stop to discuss) have removed or exempted from the operation of the statute of frauds certain cases in which they have concluded that the hardship forced to be endured by the parties was greater than was warranted by the benefit to be derived from enforcing the rule, and there has gradually arisen classes of cases known as "exemptions from the rule of the statute," and one class embraces what is called "cases of specific performance of parol contracts for the transfer or conveyance of real estate." The agreement in this case did not contain anything by which it can be known whether the transfer of the property to plaintiff was to be effected by will or by deed, and our inquiry in reference to the power of the court to decree performance cannot be confined to either, but must include both. There is a line of authorities emanating from some of our able courts of last resort, most notably those of Indiana, Illinois, and Iowa, which denies the right to specific performance of a contract similar to the one under which the claim in this case arises, mainly upon the ground that the statute was enacted to cover just such cases; that it will work no hardship to require parties to put all such agreements in writing and that the testimony of witnesses should not be received, probably several years after the happening of the event, to establish a contract by parol, by which the course of the descent of lands will be changed. These are strong and cogent reasons, and it is not our province to attack or attempt to refute them. As we understand it, they are the underlying, principal reasons for the rule as embodied in the statute; but we do not think the rule should be so rigidly adhered to as to accomplish a fraud as against one of the persons affected by the contract to which it is to be applied. It is a matter of discretion in the court which withholds or grants relief, according to the circumstances of

each particular case, when the general rules and principles which govern the court will not furnish any exact measure of justice between the parties. (2 Story, Equity Jurisprudence, sec. 742 ; *Clarke v. Koenig*, 36 Neb., 572.)

*Van Dyne v. Vreeland*, first reported in 11 N. J. Eq. 370, and on a second hearing, was a case in which "The father of an infant child made an agreement with an uncle of the infant, at the uncle's request, to this effect, that the uncle should take the infant and adopt him as his own child, and that he would treat him as his own son, and that the property he should have should be given to the child, so that it should belong to him at the death of the uncle and his wife. The uncle took the child and had him baptized, and the child assumed his surname, and lived with him twenty-five years. Held, that the child might maintain his bill upon the agreement after such performance." Also, " Where a father makes an agreement in reference to his infant child, from which benefits are to accrue to the child upon his performance of the agreement, after performance, the child, in his own name, may file his bill to enforce the agreement. The party for whose benefit the agreement is to be performed, and especially if any valuable portion of the consideration has been rendered by him, has a legal right to enforce it. It is of no consequence that the promise to fulfill it was not made directly to the person who is entitled to remuneration. It is enough if it was made by some one who had authority to make it on his behalf." In the text of the opinion it was stated: " In this case, if the agreement, which is the ground of the bill, is of such a character as could be enforced by either party if it were in writing, then, I think, there can be no doubt but that there has been such a part performance in this case by the complainant as will take the agreement out of the operation of the statute. The bill alleges that the agreement has been fully performed by the father of the complainant, one of the parties by whom it was made, and by the complainant,.

upon whom it imposed certain duties and obligations. The facts stated show that the complainant and his father have performed their part of the agreement as fully as such an agreement could be performed. There is nothing more for them to do. The complainant cannot be denied his redress by the mere interposition of the statute. The question is, is it an agreement of a character which can be enforced in equity?" In the report of the case in volume 12 it was held: "The principles of equity will be applied to new cases as they are presented, and relief will not be withheld merely on the ground that no precedent can be found." In the opinion the court says: "The agreement was this: Vreeland and his wife were to adopt the boy. He was to be given up to them and to be under their management and control, and when they died he was to have their property. It is true the agreement does not state whether the property should be secured to the complainant by deed, so that he might enjoy it when they died, or whether it should be left him by will. * * * In this case part performance is set up in avoidance of the statute. I think the answer admits, and the evidence shows, a substantial performance of the agreement on the complainant's part, as well as such part performance on the part of the defendant himself, as will take the case out of the operation of the statute. There has been such a performance on both sides as puts the complainant in a situation which is a fraud upon him unless the agreement is fully performed." This was a case very similar in its facts and incidents to the one at bar and directly in point.

The case of *Van Tine v. Van Tine*, 15 Atl. Rep., 249, is another case decided by the New Jersey court. The case is stated and the rule announced in the first section of the syllabus as follows: "A father gave his child, then only a few months old, to S., his sister, with a mutual understanding that she was to provide for the child and bring her up as her own. She thereupon took charge of the child, re-

fused to give her up to her father, and had her baptized in her own name, by which the child was always known. The child always lived with S., assisted her in her household duties, called her 'mother,' and was not informed of her parentage until she was eighteen years old. S. often stated that the child was to have all her property, and about fourteen years before her death made a will, bequeathing to the child all her personal property, at which time she owned none but personal estate. But a few months before her death she purchased the land in question. Her death was sudden and there was nothing to show that she bought the land to prevent that much of the estate going to the child. Held, that the child was entitled to the land, as the agreement of S. to receive her as her own was valid and binding, though not in writing, and had been partially performed." In the opinion the court said: "The obligations of parties to each other are ascertained as well by what they say as by what they do; admissions often giving the best and truest interpretation to contracts previously entered into; or doings showing what has previously been agreed to be or promised should be done. When Mrs. Stryker, being childless, said to her brother Peter, the father of Jessie, that she would take Jessie and would treat her as her own child, she meant just what she said, both in law and in conscience. She meant that Jessie should have all the benefit of the relation of parent and child. If individuals are ever to be taken at their word and held to it by the courts, surely they should be so taken under such circumstances as are here presented. How can the court say that Mrs. Stryker did not mean just what she said? and how can it say that she did not, by what she said, most fully and distinctly bind herself to perform all the obligations of a parent towards a child towards Jessie? And were not those obligations so made of the same force as she would have been under to a child of her own loins? I cannot see how obligations, so vol-

untarily assumed by a citizen, so affecting the highest wel-
fare of an infant of the tenderest years, can be regarded as
otherwise than the most sacred and binding.   There was
part performance of the obligation." (See, also, *Johnson v.
Hubbell*, 66 Am. Dec. [N. J.], 773, and authorities cited in
note on page 784, under the head of "Agreements to make
particular disposition of property by will.   (1) Validity of
such agreements, and (3) mode of enforcement in equity.")
"It seems to be settled that the payment of the considera-
tion will not in general be deemed such a part performance
as to relieve a parol contract from the operation of the
statute; but the reason for this, viz., that in such a case the
repayment of the consideration will place the parties in the
same situation in which they were before, shows that the rule
applies to a moneyed consideration.   If the consideration
for the contract be labor and services, those may sometimes
be estimated and their value liquidated in money, so as
measurably to make the promisee whole on the promisor's
rescission of the contract; but in a case where the services
rendered were of such a peculiar character that it is impos-
sible to estimate their value to the promisor by any pecuni-
ary standard,   *   *   *   it is out of the power of any
court, after the performance of the services, to restore the
promisee to the situation in which he was before the con-
tract was made, or to compensate him in damages.   Such a
case is clearly within the rule which governs courts of
equity in carrying parol agreements into effect, where pos-
session has been taken of landed property or moneys laid
out in improvements upon land which the testator agreed
to devise in consideration of care and maintenance during
his life.   (*Rhodes v. Rhodes*, 3 Sandf. Ch. [N. Y.], 279.)"

In *Wright v. Wright*, 58 N. W. Rep., 54, a Michigan
case, the court held: "Defendant in his second year was
indentured to deceased until his majority.   When he was
eight, deceased and his wife, being childless, adopted him
under the law then in force and his name was changed.

He gave them his entire services without pay till he was over twenty-two, when deceased died. The widow testified that they intended that he should be their heir; that her husband believed that this was effected by the adoption; that defendant thought he was their child till after her husband's death, and that they never talked about paying him for his services. The adoption law was held unconstitutional. Held, that defendant's performance entitled him to the inheritance, by way of specific performance of the oral contract," and states in the opinion : " In *Shahan v. Swan*, reported in 26 N. E. Rep., 222, the supreme court of Ohio expressly recognize the doctrine of these cases. It there said : ' Notwithstanding that it is the established rule in Ohio that the payment of the consideration, even in the personal service of the party seeking relief, does not ordinarily constitute such part performance as will take the case out of the operation of the statute, we do not wish to be understood to hold that cases may not arise where specific performance of a contract in parol may be had on the ground that the consideration had been paid in personal services not intended to be and not susceptible of being measured by a pecuniary standard.' "

*Sutton v. Hayden*, 62 Mo., 101, was a case in which one Mrs. Green made an agreement by which she took, in its infancy, the child of her brother, upon the understanding that at her death all the property owned by her should go to the child. The child was to come and live with her, be as a daughter to her, and take care of her for the remainder of her life. The child entered upon the performance of her part of the agreement, and throughout the course of Mrs. Green's life rendered the services, and, so far as lay in her power, performed her part of the agreement. Mrs. Green died without having in any way secured the property to the child. Say the court: " There are things which money cannot buy; a thousand nameless and delicate services and attentions, incapable of being the subject of explicit

contract, which money, with all its peculiar potency, is pow-
erless to purchase.    The law furnishes no standard whereby
the value of such services can be estimated, and equity can
only make an approximation in that direction by decreeing
the specific execution of the contract." See, also, *Sharkey
v. McDermott*, 91 Mo., 655, 60 Am. Rep., 270, where it
was held that an agreement by a man and his wife to adopt
a child, provide and care well for her, and leave her their
property at their death, performed on the part of the child,
is enforceable as to the property on their death.

In *Brinton v. Van Cott*, 33. Pac. Rep. [Utah], 218, it
was held as follows : " A verbal contract, whereby plaintiff
agrees to live with and take care of an old woman until
her death in consideration of her promise to leave all her
property to plaintiff, is taken out of the statute of frauds
by the rendition of the services during the lifetime of the
woman; and after her death, equity will specifically enforce
the contract, on the theory of part performance, since the
services rendered are of a peculiar character, not intended
by the parties to be measured by a pecuniary standard.
*   *   *   A contract by which an old woman, in apparent
good health and having the expectancy of many years of
life, agrees to leave all her property, worth about $5,000,
to a sixteen-year-old girl, in consideration of the latter's
promise to live with and take care of her as long as she
lives, is not void for want of mutuality and fairness; and
after her death the contract will be specifically enforced in
favor of the girl, who performed her part of the agreement
though the woman died within three or four months after
the execution of the contract." Also, "In this territory
the statute of frauds is in full force. (2 Comp. Laws, sec.
2831.) It is therefore incumbent upon the appellant to
show by her complaint that she has partly or wholly per-
formed her contract, so as to take it out of the statute of
frauds.    'When the consideration of the agreement con-
sists in work, labor, and services personally done and ren-

dered by the plaintiff, if the value of the same can be ascertained with reasonable accuracy in an action at law, and adequately compensated by the recovery of damages, then neither the services themselves nor the payment for them will avail as a part performance of the verbal agreement; but if the services are of such a peculiar character that it is impossible to estimate their value by any pecuniary standard, and it is evident that the parties did not intend to measure them by any such standard, then the plaintiff, after the performance of these services, could not be restored to the situation in which he was before, or be compensated by any recovery of legal damages.' Under these circumstances the rendition of the services is a part performance of a verbal agreement. The act of part performance of a verbal agreement for services must be such that it would be a fraud upon the party performing for the other party to refuse to perform his part as agreed between them. (Pomeroy, Contracts, sec. 114.)" See, also, *Korminsky v. Korminsky*, 21 N. Y. Supp., 611; *Godine v. Kidd*, 64 Hun [N. Y.], 585; *Jaffee v. Jacobson*, 1 C. C. A., 24; *McKinnon v. McKinnon*, 5 C. C. A., 530; *Haines v. Haines*, 6 Md., 435.

We will not further quote or cite authorities. We are fully convinced that the weight of authority and reason preponderates in favor of the position that the contract in the case at bar was such a one as a part performance will relieve from the operation of the statute of frauds; that there was a full performance of the contract on the part of the plaintiff and such a part performance by the Spilineks as did so take it out of the operation of the statute. We are further satisfied that the child had a right to bring the action to enforce the contract made for it by the parents, and that the proof of the contract was sufficiently clear, definite, satisfactory, and unequivocal to call for its enforcement by a court of equity, in the exercise of its discretion. The judgment of the district court is reversed, so

far as it affected the rights of the plaintiff herein, and a decree is ordered in this court in favor of appellant, that the title to the property, described in the petition, is in appellant, and that it be quieted in her, except as against the mortgage liens thereon prior to the death of the Spilineks.

DECREE ACCORDINGLY.