WILLIAM A. HARRISON ET AL., APPELLANTS, V. FREDERICK J. HARRISON ET AL., APPELLEES.

FILED NOVEMBER 21, 1907.   No. 14,992.

1. **Specific Performance:** ORAL CONTRACT: EVIDENCE: PERFORMANCE. The law is well settled in this state that an oral agreement to convey real estate will be specifically enforced where the evidence of such agreement is clear and satisfactory, and the plaintiff has fully performed on his part.

2. ———: ———: ———. Where the acts performed by the plaintiff tend to show, not only that there was an agreement, but also throw some light on the nature of that agreement, the evidence cannot be said to rest wholly in parol, the parol evidence being auxiliary to the proof afforded by the case itself.

3. **Declarations against interest** cannot be annulled or explained away by counter declarations.

APPEAL from the district court for York county: ARTHUR J. EVANS, JUDGE. *Affirmed.*

*Charles F. Stroman* and *Gilbert Bros.,* for appellants.

*Power & Meeker, F. J. Harrison* and *E. F. Harrison,* contra.

DUFFIE, C.

This action was brought to partition the southeast quarter of section 29, township 10, of range 2, in York county, Nebraska. The land was owned by James Harrison, who died intestate in February, 1905, leaving as his

only heirs the plaintiffs William A. Harrison, a son, Hattie E. Shepardson, a married daughter, and the defendant Frederick J. Harrison, his youngest son. The following facts are not in dispute: The wife of James Harrison, the decedent, and the mother of the children above named, died in 1873, in the state of Iowa, where the family then lived. At the time of their mother's death William A. Harrison was about six years old, Frederick J. about three years, and Hattie but a few weeks old. Some four years after the death of their mother, the children William A. and Hattie E. came to York county, Nebraska, with their grandfather, Frederick J. and his father remaining in Iowa until about seven years later, when they also came to York county. The father never remarried, and, after moving to York county, James Harrison, who was a stone mason, continued to work at his trade, boarding most of the time at restaurants and hotels up to the year 1893. In the year 1890 James Harrison and Frederick J. went to Denver, Colorado, where Frederick secured employment as an apprentice to a plumber of that city, and during his employment there for less than a year gained some knowledge of the trade. In the summer of 1891 he came to Lincoln, Nebraska, and his father returned to York county. The farm in question was purchased by the father in the year 1892, and in the spring of 1893 he and his son Frederick J. moved upon the farm, living there together until 1898, when Frederick J. was married, bringing his wife to the farm, where they continued to live with the father until his death in February, 1905. In the meantime William A. Harrison had married, and was living in the state of Colorado. The daughter Hattie had married one Shepardson and was living with her husband in York county, some three or four miles distant from her father's farm. After the death of James Harrison, Frederick J. continued in possession of the farm, asserting title thereto under an alleged oral agreement with his father. This action for partition was commenced by his brother and sister, and in an answer

and cross-bill filed by Frederick J. it is alleged that, from the time that his father came to York county in 1884 until the latter part of 1891, he continued to work at his trade as a mason in the city of York, boarding and lodging first at one place and then another, having no fixed place of abode, and none of his children or other relatives with him; that, during the latter part of the year 1891 and the early part of 1892, his father urged him to give up his plan of pursuing the plumber's trade, and to make arrangements so that they could live together during the remainder of his father's life, and, as an inducement to do so, his father offered to purchase a farm in York county where they would make a home and live together; that, in consideration thereof, upon the father's death, the farm should become the property of the said Frederick J. Harrison; that he accepted this proposition and came to York county from Lincoln in the spring of 1892, and, with his father, selected the farm in question, his father paying $4,000 therefor; that the farm was leased at the time, so that they did not occupy it until the spring of 1893, when they took possession together under their said oral agreement, and from that time forth defendant continued in possession with his father and occupied the same until his father's death. It is alleged that he fully performed the agreement upon his part, and that, because of said agreement and his performance thereof, he became the owner of said farm, and that the plaintiffs have no right, title or interest therein. The prayer is for a decree quieting his title. The district court entered a decree quieting title in the defendant Frederick J. Harrison, from which the plaintiffs have appealed.

In a brief of exceptional merit plaintiffs insist that this court has gone to extreme lengths in enforcing oral agreements for the conveyance of real estate, and that there is danger of wholly ignoring the statute of frauds and the statute of wills in a too liberal policy of allowing the title to real estate to be questioned or ordered transferred from one party to another on evidence which is wholly oral. It

is said that there were special equities in the case of *Kofka v. Rosicky,* 41 Neb. 328, and in *Teske v. Dittberner,* 63 Neb. 607, which appealed to the court for a relaxation of the rigid rule requiring evidence of the clearest and most satisfactory character to justify a court in decreeing specific performance of an oral contract for the conveyance of real estate; but, as is well said in *Kofka v. Rosicky, supra,* the statute of frauds should not be so rigidly adhered to as to accomplish a fraud against one of the persons affected by the contract to which it is sought to be applied, and the discretion of the court ought to be applied to each particular case when the general rules and principles which govern the court will not furnish any exact measure of justice between the parties. The statute itself recognizes the right of a court of equity to establish a claim against, or a right to a conveyance of, real estate by oral evidence in providing that "nothing in this chapter contained shall be construed to abridge the powers of the court of chancery to compel the specific performance of agreements in cases of part performance." Comp. St. 1905, ch. 32, sec. 6. By a series of decisions ending with *Peterson v. Estate of Bauer,* 76 Neb. 661, this court has firmly established the rule that oral contracts relating to interests in real estate will be specifically enforced when the evidence establishing such a contract is clear and satisfactory. In the case last cited it is said by Mr. Justice LETTON: "It is impossible to reconcile the views of the various courts of the United States upon the questions presented, but this court has adopted the rule in *Kofka v. Rosicky, supra,* and we are content to abide by the doctrine of that case as being the most apt to prevent injustice and to do equity. In such a case, if the trial court, bearing in mind the ease with which claims may be presented when the other party to the alleged contract is dead, carefully scrutinizes the evidence and weighs the same, taking fully into consideration the nature of the claims and the known inaccuracy of memory with reference to oral statements made years before the time of the trial, we think the evil

consequences to estates which may accrue and which the counsel for the defendant so strongly set forth may be greatly minimized.   The difficulty of proving contracts made many years before, when the lips of both participants are sealed, one by death and the other by the law, operates to the disadvantage of the claimant, and it may prevent a just recovery in as many cases as the ease with which claims may be trumped up may operate to spoliate estates." That this court does not stand alone in the rule adopted is shown from the following cases: *Rhodes v. Rhodes,* 3 Sandf. Ch. (N. Y.) 305; *Winne v. Winne,* 166 N. Y. 263, 82 Am. St. Rep. 647; *Twiss v. George,* 33 Mich. 253; *Svanburg v. Fosseen,* 75 Minn. 350, 74 Am. St. Rep. 490; *Brinton v. Van Cott,* 8 Utah, 480; *Davies v. Cheadle,* 31 Wash. 168; *McCullom v. Mackrell,* 13 S. Dak. 262; *Bryson v. McShane,* 48 W. Va. 126, 49 L. R. A. 527; *Howe v. Watson,* 179 Mass. 30.

It being settled that the statute of frauds does not stand in the way of the enforcement of contracts of the character alleged by the defendant, the important question in this case is:   Does the evidence entitle him to the relief awarded by the district court?   In the fall of the year 1891 the defendant was rooming with C. J. Wineingen in the city of Lincoln.   One evening during the fall he brought his father to the house, where he remained with him during the night.   Mr. Wineingen testified that in a talk between himself, the defendant and defendant's father, had during the evening and before bedtime, the old gentleman said that "he wanted Fred to go with him and live with him; that he had no home; that he had one boy that he tried to help, but it seemed that he did not take any interest in him, and thought if he could get Fred to go home with him he was going to buy a farm, or had a farm; I won't say as to that, but he wanted to get him with him to live with him, and if Fred wanted to get married he would have a home with Fred, and Fred would have what was left." Mrs. Wineingen testified that the old gentleman said "that he had come to see if he could get Fred to

go home with him; that he told Fred that he would get a farm if he would come and go home with him and stay with him, and he said that when he was through with it Fred could have it." Again she said: "He said he had come down to see if he could not persuade Fred to go home with him, and that he would buy a piece of land or farm if he would come and live with him. He said: 'When I am through with it, it shall be his.'" This conversation between the old gentleman and witness was had in Fred's presence. The following morning Fred and his father met C. W. McKee at the depot in Lincoln. The following question was asked McKee: "Will you please tell the court just what conversation you had, what was said between James Harrison, Fred's father, and yourself in Fred's presence there at the time, and what Fred said?" He answered: "Why, yes; Fred introduced me to his father, and we stood and talked a little bit, as people generally when they meet; I don't know as I can recall, something about the weather, how he was getting along, what he had been doing, something to that effect, and Fred Harrison says: 'What do you think?' he said: 'The old man is going to take me home with him.' I said: 'Is that so? Maybe that will be a very good thing.' Then Mr. Harrison, Fred's father, said: 'I came down here to persuade Fred to go home with me,' and, he says, 'I am going to buy a farm,' he said, 'and I want Fred to make a home for me as long as I live, and when I am gone,' he said, 'the farm is Fred's.'" Sidney Roberts, who met them on this occasion, testified that Fred introduced him to his father; that the old gentleman said that he wanted to make a home for him and Fred; that he had no particular home, and that he would like to get a place where he could make a home; that he thought he could get a place near York; that Fred would stay with him, and when he died he would give Fred the farm; that when he died Fred could have it, it would be Fred's place. "I told Fred it would be a good idea for him to go with his father; and he replied that he believed that he would." Mrs. Briley testified that some

time' in the year 1892 Fred and his father came to her house after the supper hour, and Fred's father apologized for making her get an extra supper, and stated why it was; that they had been out in the country looking at a farm that he was intending to buy. He then went on and told her that he was going to buy a farm to make him and Fred a home; that he had got tired of boarding around and knocking around for a home; that he and Fred always got along well together, and that it would be nice for them both to have a home. During the time that Fred and his father were in possession of the farm the father talked with his neighbors relating to the arrangement under which they were living there. Mr. E. F. Chittenden testified that "he would come down Sundays and take dinner or supper, and, when he got to talking about the farm, I asked him why it was that he would go and buy a farm. He was not able to run it. He was a stone mason, and not able physically to work it. He told me that he bought it with the expectation of having it for Fred. He had made arrangements for Fred to take care of him, and he was to have the farm. That is what he told me, I think, two or three times, or that once anyhow." Further on he testified that the old gentleman said that Fred should have the farm when he was through with it himself; that Fred was to take care of him as long as he lived, and he expected Fred to have the farm; that is the reason he had it, not for his own use to farm himself, but he expected Fred to have it; that Fred was to have the place for taking care of him. Mr. Benner testified that "James Harrison came to his place one day and seemed to be tired; that he asked him why he did not keep his money when he had it, and not lay it out in a farm, as he was not able to work; that the old gentleman replied that he bought it for Fred."

The fact that Fred abandoned the plumber's trade and went to live with his father upon the farm, where he worked without pay of any kind for five years, or until his marriage in 1898, is a circumstance which, we think, strongly corroborative of the claim that this service was

performed under the agreement alleged in the answer and cross-bill and testified to by the witnesses. It is not usual for a young man, after attaining his majority, to go on a farm, and live alone with his father, having no women folks to look after the housework, without pay as the services are performed or an agreement for remuneration in the future. Defendant testified on cross-examination that after his marriage in 1898 he received one-half the crop raised upon the farm, but he explained that this was under an agreement made at that time, his father recognizing that he should have a portion of the crop in order to properly care for his wife and supply her with such household necessities as she might require. All the circumstances make the defendant's claim consistent and probable. His father had reached an advanced age. He had no home. He was living at boarding houses and hotels, with no one but strangers to look after his wants. It was natural that he should desire a permanent home and the companionship and care of some near relative. Under these circumstances it is not difficult to believe that he should make such a contract with Fred as the witnesses have related. It is hardly fair to presume that he would ask his son to abandon a trade, which he had partially learned, to live with him without pay until his death; and, as before stated, it is hardly probable that one who had his own way to make in the world would care to give up some years of his life to the care of a farm without some inducement held out to him to do so. The evidence, we think, conforms to the rule stated in Waterman, Specific Performance of Contracts, sec. 261, that the act performed tends to show, not only that there was an agreement, but also throws light on the nature of that agreement, so that neither the fact of an agreement nor even the nature of that agreement rests solely upon parol evidence, the parol evidence being auxiliary to the proof afforded by the circumstances of the case itself. A reading of the record convinces us that the agreement was made as alleged; that there has been complete perform-

ance on the part of the defendant, and that he is entitled to a specific performance of the contract.

The testimony of the neighbors to declarations of James Harrison that the farm was bought for Fred and that Fred was to have it after his death was taken by the court upon the principle that declarations against interest are always admissible, and that such declarations on the part of the decedent were in derogation of his absolute title to the farm; that he recognized and admitted that defendant had an equity in the land. The plaintiffs offered to show that on one or more occasions the decedent had made statements to the effect that he would not give his property to one child; that he would divide it equally among his children; that he stated that they wanted him to give the place to Fred, but he would not get it, and other similar declarations claimed to have been made by him. The court refused to receive this testimony, and error is claimed. *Foster & Foster v. Nowlin,* 4 Mo. 18, is cited as an authority to the effect that declarations made by a party since deceased, declaring that certain property belonged to him, was admissible and competent to rebut other evidence of his declaration to the contrary. We do not think that the weight of authority sustains this holding. In *Wilson v. Patrick,* 34 Ia. 362, it was held that antecedent declarations of a party that he was absolute owner of certain property were not admissible to counteract his admissions that he owned it as security only; and in *Nutter v. O'Donnell,* 6 Colo. 253, it is said that declarations against interest cannot be annulled or explained away by counter declarations. The rule announced in *Foster & Foster v. Nowlin, supra,* is no longer the law in Missouri, as that case is disapproved and the principle repudiated in *Turner v. Belden,* 9 Mo. 797.

The evidence satisfies us that the decree entered by the district court was the proper one, that there is no reversible error in the record, and we recommend an affirmance of the judgment.

EPPERSON and GOOD, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.