(125 N. W. 1032.)

---

DAVID W. CASSEDAY AND MILBURN SANDEFUR, FOR THE USE AND BENEFIT OF AMELIA E. KINSLOW, v. GEORGE A. ROBERTSON.

Opinion filed March 14, 1910.

**Adverse Claims — Evidence — Judgment.**

> 1. In an action to determine adverse claims to a part of a lot in the city of Kenmare, and to recover damages for the withholding thereof, evidence examined, and *held,* sufficient to sustain the judgment for plaintiff.

**Costs Dependent Wholly upon Statute.**

> 2. Costs are purely the creature of the statute, and can be awarded only when expressly authorized by law. It is accordingly *held,* that an allowance of $100 by way of attorney's fees is erroneous, and the judgment is modified by eliminating such item therefrom.

Appeal from District Court, Ward county; *Goss, J.*

Action by David W. Casseday and Milburn Sandefur, for the use and benefit of Amelia E. Kinslow, against George A. Robertson. From a judgment in favor of plaintiffs, defendant appeals.

Modified and affirmed.

*Palda & Burke,* for appellant.

*Gray, Keith & Gray,* for respondent.

CARMODY, J. This is an action to determine adverse claims to the west 15 feet of lot 4, block 1, in the city of Kenmare, and to recover damages for the withholding thereof. From a judgment in favor of plaintiffs, defendant appeals to this court and desires a review of the entire case.

The facts are as follows: The Soo Railway Company obtained title to the town site of the city of Kenmare, by filing script covering the same, some time before the year 1898. That patent was issued on November 25, 1900. That not later than July 1, 1899, the interest of the railway company was transferred to plaintiff, David W. Casseday. That prior to that time the railway company, one W. T. Smith, and one E. C. Tolley entered into an agreement, whereby the town site of Kenmare should be their joint property in proportions, as follows: Railway company one-half interest; Tolley and Smith each one-fourth. Casseday succeeded to the railway company's interest; the title to remain in the railway company and Casseday as its successor until such time as the patent should be issued and Tolley and Smith should pay the railway company their proportionate share of the cost of the script and expenses. That on or about the 12th day of June, 1901, the said Casseday, pursuant to the agreement, transferred one-fourth of the land to W. T. Smith and one-fourth to Milburn Sandefur, who held the title for E. C. Tolley. That the tract in controversy was in the transfer to Sandefur. That on the 6th day of January, 1905, Sandefur conveyed the tract in controversy to plaintiff Kinslow. That Tolley was the agent of the railway company, and later the agent of Casseday. That on or about March 1, 1897, appellant, Robertson, went into possession of lots

4 and 5 in block 1 in the city of Kenmare. That the possession was peaceable and with the consent of E. C. Tolley, in accordance with the usual custom of the town-site owners allowing persons desiring the lots to go into the possession of the same with the understanding that, as soon as the patent was issued, deeds would be delivered. That appellant's possession of lot 5 and the west 15 feet of lot 4 continued peaceable, open, and notorious until the fall of 1901 or 1902, when a notice to vacate the premises in controversy was served upon him. That he, however, remained in continuous possession, having built a lean-to 12½x40 feet, in which he and his family have always lived while in Kenmare on the west 15 feet of said lot 4, which lean-to adjoins his store on lot 5; the same having been built according to the agreement with Tolley during the year 1897 or 1898. That appellant at no time paid rent for the premises in controversy, but always paid the taxes. Appellant claims that at the time he made the agreement for lots 4 and 5 he made the agreement for lot 6 adjoining. This plaintiffs deny, claiming that some time after appellant went into possession of lots 4 and 5 he surrendered possession of lot 4 and took possession of lot 6 in place thereof. That during the month of February or March, 1901, plaintiff Casseday came to Kenmare for the purpose of making a settlement with his co-owners and the purchasers of lots, at which time the price of appellant's lots was agreed upon at $150 each. That shortly thereafter, and in March of the same year, the defendant, who was in the general mercantile business, gave credit on his books to E. C. Tolley in the sum of $375, which appellant claims was the purchase price of lots 5 and 6 and the west 15 feet of lot 4 in said block 1. That during the summer and fall of 1901, merchandise was sold by appellant to E. C. Tolley and W. T. Smith and charged to their accounts as follows: .Tolley, $332.88; Smith, $55.11. That during the summer of 1901 appellant, about the month of August, drilled a well and excavated a basement under his store building on lot 5 and the lean-to on the 15 feet in dispute and built a stone foundation thereunder; the value of which improvements on the 15 feet being: Well, $150; excavating and foundation, about $500. That during the summer of 1901 the husband of plaintiff, Kinslow, who owned lot 3 in said block 1 and had a hotel thereon, purchased the east 10 feet of lot 4.

Appellant specifies numerous errors of law, and also specifies ultimate facts which he claims to be established by the evidence in the case. Under our view of the case, a correct decision depends wholly on questions of fact. It is well settled that a party who, under an oral contract, has purchased real estate, goes into possession, made valuable improvements thereon, and paid the purchase price, is entitled to specific performance of the contract. Thomas v. Dickinson, 12 N. Y. 364; Kofka v. Rosicky, 41 Neb. 328, 59 N. W. 788, 25 L. R. A. 207, 43 Am. St. Rep. 685; Stowell v. Tucker, 7 Idaho, 312, 62 Pac. 1033; Engholm v. Ekrem, 18 N. D. 185, 119 N. W. 35; 8 L. R. A. (N. S.) 877, note; 3 L. R. A. (N. S.) 790, note. The part performance on the part of the appellant, Robertson was sufficient to take the contract out of the statute of frauds. Engholm v. Ekrem, supra; Muir v. Chandler, 16 N. D. 551, 113 N. W. 1038; Roberts v. Templeton, 48 Or. 65, 80 Pac. 481, 3 L. R. A. (N. S.) 790.

E. C. Tolley, a witness for plaintiffs, testified that the defendant prior to 1901, selected lots 4 and 5 in block 1 as two lots that he wanted to buy when title would be secured and when the owners were ready to transfer the property, and that later, and before the title had been acquired, the appellant selected lots 5 and 6 instead of lot 4. He also testified: That about February 18, 1901, he and plaintiff Casseday went to appellant and arranged to deed him lots 5 and 6, and at the same time arranged to deed to Kinslow, husband of plaintiff Kinslow, lot 3 and 10 feet off the east side of lot 4, and at the same time offered to sell appellant the 15 feet in controversy. That he would not take it, and that afterwards a deed was delivered to appellant for lots 5 and 6 and to Kinslow for lot 3 and the east 10 feet of lot 4. He also testified that afterwards, and during the same season, appellant asked permission to occupy the 15 feet, and offered to pay him a rental or the taxes for the time that he was on it. That appellant continued to occupy it and built the stone wall hereinbefore mentioned. That in the fall of 1901 he served notice on appellant to vacate, and again in the winter of 1905, after the 15 feet had been sold and conveyed to the plaintiff Kinslow. That appellant refused to remove, and still occupies the lean-to on the 15 feet, and has occupied it since he built it in the early history of Kenmare. Witness also testified that some time after appellant got the deed to lots 5 and 6 he wanted to buy this 15 feet, stating that his wife wanted it. Witness went to

their residence and had a talk with her relative to it. It is also in evidence that the appellant, Kinslow, and Tolley measured off Kinslow's 10 feet and ran a line between the east 10 feet and the west 15 feet of lot 4, and that Kinslow erected a fence on that line.

Plaintiff Casseday's evidence was taken by deposition. He testified: That he was in Kenmare in February or March, 1901, to close up his interest in the town site. That he saw appellant, made arrangements with him for lots 5 and 6, and asked him if he wanted to buy the west 15 feet of lot 4. Appellant refused, stating that he had land enough. Thinks he sold lots 5 and 6 for $250 each, but is not positive. That appellant was in possession of the west 15 feet of lot 4. That he afterwards deeded lots 5 and 6 to appellant. Appellant, in his own behalf, testified that about March 1, 1897, he selected lots 4, 5 and 6 of block 1, under an oral contract with E. C. Tolley, who told appellant to go ahead and build whatever he wanted to build, and when the time came, and they got their title, they would close the deal. That appellant went into possession of these three lots and erected first a store building on lot 5 and a leanto on the west 15 feet of lot 4, in which he and his family lived from the time it was erected until the time of the trial. That along in the spring of 1901, Tolley and plaintiff Casseday came into appellant's store and said they wanted to settle for the three lots, 4, 5, and 6, at $150 each, and which was satisfactory to appellant, but that Tolley told appellant he had to give the east 10 feet of lot 4 to Kinslow, and appellant consented thereto. That afterwards he and Tolley took a tapeline and measured off the 10 feet, and Kinslow set the stake and afterwards built a fence on the line. That appellant then asked Tolley if it was all right for appellant to go to work and excavate as far as his building extended on the 15 feet, which was 12½ feet. That Tolley said: "Yes, sir; go ahead. It is yours." And that appellant excavated under the building and put in a basement and dug a good cellar and afterwards bored a well. That in the fall of 1901 Francis J. Murphy, who was in the employ of Tolley, brought him a deed from Casseday to lots 5 and 6. That appellant told Murphy that the half lot should also be in the deed, and went with Murphy to Tolley's office and told Tolley that the deed was not right. Tolley said he knew it was not right, and said he would go to Minneapolis and get it fixed. That appellant left the deed with Tolley. That Tolley went to Minneapolis. When he came back appellant met him, but

Tolley told him the deed was not fixed, but that he would go down again and have it fixed. That he never saw the deed again and never heard anything more about the lot until late in the fall of 1901 or 1902, when papers were served on him to vacate. That in the spring of 1901 Tolley told appellant, who was then keeping a general mercantile store, that Smith might take part or all of his share of the proceeds of the two lots and the one-half lot in trade. That appellant saw Smith, and Smith agreed to do it. That appellant, about the time Tolley and Casseday called on him, gave Tolley credit for $375, the price of the two lots and the one-half lot. Appellant claimed he was to have the 15 feet of lot 4 for $75. That Tolley took out in mercandise and cattle the sum of $332.88, and Smith took out in merchandise the sum of $55.11, part of which was an order for $44 given by Tolley and Smith to one Burke on defendant. Appellant afterwards went through bankruptcy and A. W. Gray, the trustee, finding no deed on record to appellant for any lots in Kenmare, procured from Casseday a deed to lots 5 and 6, which Gray caused to be placed on record. Appellant had previously erected a stone building on lot 6, but had disposed of lot 6 before the trial.

One Grinnell, a witness on the part of appellant, testified that he was bookkeeper for appellant in 1901, and about March 1st, by direction of appellant, gave Tolley credit by two lots and a half, $375. Smith, the co-owner with Tolley and Casseday of the town site of Kenmare, testified that in the first place appellant got lots 4 and 5 and afterwards, under some arrangements that he (Smith) knew nothing about, appellant got lot 6. Smith also testified in answer to the following question: "Do you know whether there was any talk as to what arrangement there was to be made as to lot 4 and the proportion he was to have, if any? A. Only in a general way; but I know he was supposed to get the deed for the west half of lot 4 and lots 5 and 6."

Smith also testified that appellant asked him (Smith) if he would take some goods out of the store as his part of the pay for the lots, and Smith told him he would. Smith and Tolley were in partnership in the land business, but Tolley had charge of the sales of the lots in Kenmare. The court asked the witness Smith the following question: "You stated you had an understanding that this half of the lot was to be the property of the defendant, here. Do you know where you got that? A. Through the gen-

eral talk I had with Mr. Tolley. He had charge of the sale of the various property up there all the time. Of course, I had talked it over with him as to who had the different lots, and my idea was all the time that Robertson was to have half of the lot." The following question was asked the witness Smith: "Do you remember the transaction of giving an order to one Burke to be charged to this lot account, an order for some money that you and Tolley owed Burke? A. I would not be positive that I gave any order, although there was something said about it at the time, but my recollection is not clear enough to say."

Francis J. Murphy, for plaintiffs in rebutal, testified: That he went to Kenmare on the 17th day of August, 1901, and immediately became associated with Tolley as his private secretary and as a partner in some instances. That he delivered a great many deeds for Tolley, and might have delivered the deed to appellant, but had no conversation with him in regard to the 15 feet in lot 4. That appellant did not walk down with him (Murphy) to Tolley's office and enter into conversation relative to the deed. That appellant and Tolley might have had the conversation in regard to the west 15 feet of lot 4, testified to by appellant, but that he (Murphy) did not hear it. The witness Tolley testified for plaintiffs. in rebuttal: That he did not have the conversation testified to by appellant relative to the excavation of the cellar and building the foundation or wall on the property in controversy. That the first he (Tolley) knew of it he discovered appellant's hired man excavating and dragging dirt from the west 15 feet of lot 4 onto some other lots. He (Tolley) stopped him. Appellant was not at home, but when he came back the witness went over to see appellant, who explained to him that he was trying to get the dirt out from under the main building. That appellant wanted to erect the stone wall, and witness told him if the lot was sold he would be out the stone. Appellant said if anybody bought the lot, perhaps they would want the stone wall, and if they did, he would sell it. Witness also denied that he told appellant that Smith could take out his share of the proceeds of the lots in trade. He says that he (Tolley) was responsible to Casseday for Casseday's share of the proceeds of the lots. Tolley also denied that he gave Burke, or any other person, an order on appellant. Appellant, recalled, testified that Casseday did very little talking in regard to the lots and did not try to sell him the west 15 feet of lot 4, but that Tolley, in Casseday's

presence, said he might have to give Kinslow the east 10 feet of lot 4 to keep peace in the family, and appellant said anything to keep peace in the family would be all right with him, and that shortly after Tolley came back and told appellant he (Tolley) had to let Kinslow have the east 10 feet of lot 4. Tolley denied that appellant left the deed with him (Tolley), and testified that he himself delivered the deed to appellant and never saw it afterwards.

Exhibit 3, which was a settlement between Casseday, Smith, and Tolley, was introduced by plaintiffs in evidence over the objection of appellant, and shows the sale of lots 5 and 6 to appellant for $300, and lot 3 and the east 10 feet of lot 4 to Kinslow for $250. Also shows that in the division Casseday got the property in controversy.

The court made findings of fact: That on January 15, 1901, plaintiff Casseday was the owner of the land in controversy. That on or about the 13th day of June, 1901, he conveyed it to plaintiff Sandefur. That on or about the 6th day of January, 1905, plaintiff Sandefur, by Tolley, his attorney in fact, conveyed it to plaintiff Kinslow. That defendant, George A. Robertson, has been ever since the date of said conveyance by Casseday to Sandefur, and for a long time prior thereto, in the wrongful possession of said described property. That all the averments of the plaintiff's complaint are true, except as to the allegation of damages, and all the denials and allegations of the defendant's answer are untrue.

As conclusions of law: That the plaintiff Kinslow is the owner in fee simple and entitled to the possession of said property, and that the title be quieted in her as against the defendant and all persons claiming under or through him. That plaintiff is entitled to a judgment for her costs and $100 attorney's fees, and that the defendant is entitled to remove from the tract in question any and all buildings which he has placed thereon, within 30 days after the entry of judgment.

Appellant specifies as error that the findings of fact do not cover all the material facts involved in the issues as presented by the pleadings, and contends that the failure so to find constitutes ground for a new trial or reversing the judgment in this particular instance; that a judgment, entered without findings, disposing of all material issues of fact, is erroneous. We think the findings are sufficient to justify the judgment. Section 7229, Rev. Codes 1905. While there are some circumstances surrounding the transaction

that tend to sustain appellant's contention, we think the evidence sufficient to sustain the judgment. There is no doubt but what the appellant could have surrendered lot 4 and taken lot 6 in lieu thereof. A contract may be discharged by agreement of the parties, by substitution of a new contract.

The contention of appellant that there is no warrant in law for the inclusion in the judgment of $100 attorney's fees, in favor of the plaintiffs and against the defendant, must be sustained. Engholm v. Ekrem, supra.

The judgment will be modified by striking therefrom $100, and, as modified, is affirmed. Appellant to recover costs in this court. All concur.