MARTHA DITTBERNER ET AL., APPELLANTS, V. GUSTAVE TESKE ET AL., APPELLEES.

FILED DECEMBER 23, 1920.    No. 20911.

Trusts. Evidence examined and *held* insufficient to establish the parol trust pleaded in the petition.

APPEAL from the district court for Madison county: ANSON A. WELCH, JUDGE. *Affirmed.*

*Mapes & McFarland, Willis E. Reed* and *James E. Brittain,* for appellants.

*M. B. Foster* and *M. D. Tyler, contra.*

DEAN, J.

The parties to this suit are all members of the Teske family. Plaintiffs allege that they are sisters, and that the defendant Gustina Teske McAllister is their sister, and defendants Carl Teske, now and for more than 12 years insane, and Gustave Teske are their brothers. Carl Teske appears as defendant by his guardian, William C. Elley. It is alleged by plaintiffs and denied by defendants that approximately five quarter sections of Madison county land have "been impressed with an equitable trust in favor of said (Teske) family;" and that a large amount of personal property is in defendants' hands or has been wrong-

fully disposed of by them, and they "ask that an account-
ing be had by and between all parties to this action." Judg-
ment was rendered in favor of defendants; plaintiffs'
suit was dismissed and they appealed.

The plaintiffs allege that the transactions out of which
the present controversy arose had their beginning in 1872
and that no settlement has been had between the parties.

It seems that in 1871 Frederick Teske and his wife and
four minor children came to this country from Germany.
In 1872 they settled on a quarter section of government
land in Madison county and in the same year Mr. Teske
bought an adjoining quarter section. This half section
became the family home and so remained for many years.
Here the younger children, Carl Teske and Martha Ditt-
berner, were born and here in 1893 Mrs. Teske died. The
Teskes lived and worked together on the home place until
1881. In that year Gustave was 21 and was about to leave
home to earn money for himself. The defendants contend
that their parents, who could neither read nor write the
English language and were unacquainted with business
usages, agreed with Gustave that, if he would remain at
home and work the land and take care of and manage the
home farm and the business generally, for this service they
would give him one-half the proceeds of the farm, the
parents retaining the other half. Defendants also contend
that it was agreed between Gustave and his parents that
another quarter section of land should be bought for him,
and that within a year, pursuant to agreement, the "Broe-
ker quarter," as it is known in the record, was bought for
$1,050 and deeded by the parents to Gustave. Under this
agreement Gustave testified that he remained at home
until the early part of 1893, when at the age of 32 he
married and had a settlement with his father, and that his
share of the money then on hand was $3,500 which he re-
ceived in the division, that being all the money that he ever
received from the home place or from his father. At about
the same time or soon thereafter Gustave sold the "Broeker
quarter" to his brother Carl, for which he took his note in

the sum of $4,000, which was subsequently paid by Carl. Gustave testified that in 1893 Carl, who succeeded him as tenant and manager of the home place, bought a half-section of land north of Madison, for which he paid either $15 or $17 an acre, and that Carl borrowed a part of the money from him to pay for it, and that subsequently Carl bought another quarter of land, for which he paid $3,000, and that, to pay for it, he mortgaged the "Broeker quarter," and that he, Gustave, paid this mortgage off, as Carl's guardian, after Carl became insane. He further testified that there was never any talk among the members of the family while he was at home, nor that he ever heard of any agreement or talk, to the effect that any property of the family or any part of the property in controversy should be or that it was the joint property of the family.

Mrs. Dittberner testified, on plaintiffs' part, that her father was the director of the work on the home farm, and that the girls did all kinds of farm work just the same as the boys; that the talk in the family was that if Gustave got the "Broeker quarter" of land he would not get any money; that the land was farmed by all the family together and the proceeds were placed in a common fund. Alvina Dittmar, one the plaintiffs, testified that she and her sister Gustina worked in Omaha during the winter as domestics and worked at home on the farm during the summer; that at one time they sent $500 home, and that their father used it in the purchase of a horse, some farm machinery, and a wagon; she corroborated the testimony of Gustina with respect to the work that the girls did on the farm, and further testified that she became the owner of some town property and that the rents therefrom were used in the business on the farm. She said that the land "was simply a company farm," and that the father said the children were to have a farm apiece. Albert Crane, formerly an employee of the Teskes, testified that he heard Carl Teske in speaking of the land say, "we own it altogether;" and that this statement was made after father Teske died. Henry Kerich is a brother-in-law of Gustave Teske. He testified

Dittberner v. Teske.

that he had seen the Teske girls working on the farm, "not once but hundreds of times," and that they were doing all kinds of farm work; that father Teske could not speak English, and that he had a talk with him about a year or two before his death in his native tongue, and that the old gentleman and Carl said they were all working together, and that Carl said he was foreman; that he had another talk with the family when the mother was living, and she said, in speaking of the children, "They will be satisfied and the time will come when they will get their share. So far they have worked well"—"and he (the old gentleman) said, 'Yes, yes.' I heard several such conversations during my visits;" that mother Teske said, "Carl is always satisfied with anything his father does, and never hardly questions anything." Sheriff Smith testified that in 1896 or 1897 or 1898 he took out some blank deeds or papers "made out to be signed up by Carl and the old man." He thought that Carl and the two older girls were at home, and that he told them he came out there to talk with them about dividing up the property, and that "the girls run us off the place; told us to get off the place. They said all that land belonged to them;" that he had seen them work on the farm and haul grain and the like. On cross-examination he testified: "Q. You went out with the old gentleman. What did you say after you had been run off of the place by the girls? Do you remember what, if anything, the old gentleman said then? A. I can't tell just exactly. He said why if they don't want to he would let it go."

Gustina McAllister testified, on the part of defendants, that when the family came to Nebraska in 1872 she was 15. She corroborated Gustave's evidence respecting the contract he made with his parents to farm the land on shares, and also respecting Carl's purchase of the "Broeker quarter" from Gustave when he married and left home. She testified that it was then agreed between Carl and his parents that Carl, on account of the parents continued inability to speak the English language or to transact business, should take Gustave's place as farm and business

Dittberner v. Teske.

manager. She said that Carl afterwards bought a half section of land north of Madison for $5,000, and that he subsequently deeded a quarter section of it to her because she stayed at home and worked longer than the others; that she never made any claim on Carl for the $1,000 that he was to pay her under the oral agreement with his father, that will be presently noted. She further testified that about three years before the present case was tried she was visiting with her sister, Martha Dittberner, and that Frederick Dittberner, her husband, in Martha's presence said this in regard to Carl Teske's land: "Q. Now, you may state what the talk was, what Mr. Dittberner said there in the presence of yourself and Martha Dittberner. A. Well, he said to me, 'Let us take each one piece of land from Carl, and if Carl should get healthy and well again we can give it back to him.' I told him, 'Fred, that don't go. The court will overrule that.' * * * Q. You may state whether you ever at any time heard any talk in the family by your father, mother or sisters or brothers, that all of the land that Carl had and your father had and all the rest of you had was to belong to all of you—belong, not to Carl or to your father or to whoever had title to it, but to all of you? A. There was no such socialist talk, it wasn't in our family."

It appears that in January, 1893, Carl and his father made an oral agreement, and by its terms the home place was, upon the death of the parents, to become Carl's property; that at the time Carl went into and retained possession; that the consideration for the land was that Carl would provide support and a home for the parents, and give the three sisters $1,000 each, pay all taxes, keep up the improvements, and pay his parents each $100 a year provided they chose to leave the home place and live elsewhere. The part of the agreement that devolved upon Carl was in all respects performed by him.

Several circumstances stand out prominently in the record tending to show that the property in suit was not community property. Only a few will be noticed. In 1909

Alvina Dittmar, one of the plaintiffs, sued to compel Carl to convey to her one of the quarter sections of land in controversy here, alleging that he had so agreed. In that case a judgment was rendered against her in favor of Carl Teske. It seems to us that by instituting and pressing her suit she thereby admitted Carl's ownership and the validity of the oral agreement of 1893. It appears, too, that Mrs. Dittmar filed a claim against the estate of her insane brother, Carl, for the $1,000 that was payable under the oral agreement. The money and interest thereon was paid to her in July, 1913, in all amounting to $1,704.88. Her receipt filed in the county court *inter alia* recites that it is for "the one thousand dollars due Alvina Dittmar under and by virtue of a certain oral agreement entered into in January, 1893, by and between Frederick Teske and his wife and the said Carl Teske." So that again is the validity of the oral agreement recognized. Another circumstance: After the death of his wife, Frederick Teske deeded one-half of the home place to Martha Dittberner, one of the plaintiffs. Carl then began an action to cancel the deed and to compel specific performance of the 1893 contract. He obtained judgment against Mrs. Dittberner, that was affirmed, after three hearings in this court, except as to a 46-acre tract because of its homestead character. This feature of the Teske litigation is discussed at great length in *Teske v. Dittberner*, 63 Neb. 607, on rehearing, 65 Neb. 167, on second rehearing, 70 Neb. 544, and need not here be further discussed more than to add that in the final rehearing it is said: "The agreement in question is testamentary. * * * They (such agreements) have been upheld and enforced from an early period. * * * Nor is it necessary that the agreement be in express terms to make a will. A promise that the promisee shall receive the property, or that it shall be left to him, at the death of the promisor, is sufficient. *Kofka v. Rosicky,* 41 Neb. 328."

The record, when considered in its entirety, seems conclusively to show that the Teske family did not own any

of the property in common that is involved here or that is referred to in this action as contended by plaintiffs. We conclude that the evidence is insufficient to establish the parol trust pleaded in the petition. The judgment of the district court is right, and it is

AFFIRMED.