CHARLES W. MOLINE, APPELLANT, V. EVA CHARLOTTA CARLSON; JOHN J. JOHNSON, EXECUTOR, ET AL., APPELLEES.

FILED NOVEMBER 13, 1912. No. 16,860.

1. **Specific Performance**: PAROL CONTRACTS. The rule is now well settled in this court that a parol contract will be enforced by a court of equity where one party has wholly and the other partly performed it, and its non-fulfillment on the one hand would amount to a fraud upon the party who has fully performed it.

2. ———: AGREEMENT TO DEVISE: DEFENSE BY HEIRS. Where a husband and wife take into their family the infant child of a stranger, and either then or subsequently they jointly orally agree that, if such child will remain with them during their lives and render them faithful and obedient service as a child, they will, at their death, by will or otherwise, leave him all of the estate of which they die seized, *held*, that the statute as to homesteads cannot be pleaded by the heirs of either the husband or wife as a defense to a suit by such child for the enforcement of the parol contract.

3. **Contracts**: EVIDENCE. The evidence examined and set out in the

opinion, *held*, that the parol contract in this case possessed the elements of certainty, and the proof establishing it is sufficiently clear and satisfactory.

APPEAL from the district court for Saunders county: GEORGE F. CORCORAN, JUDGE. *Reversed with directions.*

*C. Petrus Peterson* and *Charles H. Slama,* for appellant.

*B. E. Hendricks* and *Simpson & Simpson, contra.*

FAWCETT, J.

This suit was instituted in the district court for Saunders county to quiet title to the east half of the northwest quarter and the north half of the northeast quarter of the southwest quarter of section 25, township 14, range 8, in said county. The decree quieted plaintiff's title to an undivided one-half interest in the land, and dismissed the suit as to the other half. Plaintiff appeals.

Plaintiff relies upon a parol contract, which he sets out as follows: "That on September 1, 1896, and at many divers times prior and subsequent to said day, said Peter A. Carlson and his wife, the defendant Eva Charlotta Carlson, orally promised that, in consideration of the plaintiff's services and of the plaintiff remaining with them on their farm until said Carlson's death, they would leave to plaintiff, by will or otherwise, all of said Carlson's estate of which he would die seized, and that plaintiff would be made Carlson's residuary legatee; that in consideration of said promises, and relying thereon, the plaintiff yielded to the request and agreed thereto; that he refused to go with his own father, that he sacrificed all other opportunities for his own advancement, and remained with the said Peter A. Carlson, serving and obeying said Carlson in all his wishes and desires, and rendered unto said Peter A. Carlson full and faithful service in implicit reliance upon the said oral agreement; that pursuant thereto said Peter A. Carlson did execute a will

conforming to said agreement; but that thereafter said
Peter A. Carlson wrongfully executed another will giving
plaintiff the sum of only $400." The petition also alleges
that the land belonged to Carlson in his lifetime; that
Carlson died March 24, 1909; and that defendant John-
son is the duly qualified executor of the will of said Carl-
son, deceased.

The defendant Eva Charlotta Carlson entered her vol-
untary appearance in the suit, and filed her answer, in
which she admits all the allegations contained in and
consents to the prayer of the petition; and further al-
leges "that this action is brought with her consent and to
satisfy her wish and desire that the agreement between
this defendant's lamented husband and the plaintiff may,
in justice and equity, be fulfilled, so plaintiff will be the
sole residuary heir of Peter A. Carlson, deceased."

The heirs of Peter A. Carlson being all nonresidents of
Saunders county and unknown to plaintiff, service was
had upon them by order of the court, in accordance with
the provisions of the statute in such case made and pro-
vided. After disposing of certain motions and demurrers,
which we deem it unnecessary to refer to, Ida Sofia Ahlen
filed her separate answer, alleging that said Carlson left
as his only heirs at law and next of kin Eva Charlotta
Carlson, his widow, Carl W. Carlson, a brother, and John
Emil Larson, a nephew, and Ida Sofia Ahlen (herself) a
niece, the last two being children of a deceased sister of
said Peter A. Carlson. She further admits the death of
Carlson; the appointment of Johnson as executor; that
Eva Charlotta Carlson is the widow of deceased; the
ownership of the land by Carlson prior to his decease;
and that plaintiff has resided upon the premises as ten-
ant of said Carlson for several years last past; alleges
the execution of the last will of Carlson; that the same
had been duly admitted to probate (attaching a copy of
the will to her answer); alleges that Carlson and his wife
resided upon the land as their home; that neither of them
during said time owned or possessed any other lands,

houses or town lots; and that the real estate in contro-versy was the home and homestead of Carlson and his wife; and denies every other allegation. The will at-tached to her answer devised the lands to the widow for her life, bequeathed $400 to plaintiff, and all the rest and residue of his property, share and share alike, to his legal heirs. The answer of defendant Johnson, executor, is substantially the same as that filed by defendant Ahlen

Carl W. Carlson first appeared especially, objecting to the jurisdiction of the court over him, which objection was overruled. He thereupon answered separately; his answer in all essentials being similar to the answer of defendant Ahlen. John Emil Larson, the nephew referred to in the answers of Mrs. Ahlen and Carl W. Carlson, made no appearance.

The reply to the three answers above set out denies all allegations of such answers, except such as admit allega-tions in plaintiff's petition.

The decree found that, under the pleadings and answer of defendant Eva Charlotta Carlson, plaintiff is entitled to judgment against her; finds all the allegations of the three answers above set out to be true; and that as to said defendants and each of them the plaintiff has no cause of action; finds that the land in controversy was in September, 1896, occupied by Carlson and his wife as their homestead; that the same constituted their home-stead at all times thereafter until the death of Peter A. Carlson; that the value of the lands in September, 1896, was $3,000; adjudged that the plaintiff is the owner of an undivided one-half of the lands, "being such interest only as the defendant Eva Charlotta Carlson had in said lands as the widow of Peter A. Carlson, deceased;" quieted in plaintiff title to such half interest, subject to any rights the executor may have for the payment of debts and expenses of administration; that as to the de-fendants, other than Eva Charlotta Carlson, plaintiff's action be dismissed.

The issues presented for our consideration are stated in

the brief for appellees as follows: "First. Was any oral contract entered into between Peter A. Carlson, the testator, and the appellant herein, whereby Carlson obligated himself to convey the land described in the petition to the appellant, either by will or otherwise? Second. Was the land owned by Peter A. Carlson at all times his family homestead, and not subject to his individual disposal?"

The first question is not accurately stated. It is not alleged that Carlson agreed to convey "the land described in the petition." The allegation is that he agreed to "leave to plaintiff, by will or otherwise, all of said Carlson's estate of which he should die seized." As thus modified, the question must be answered in the affirmative.

The defendant Mrs. Carlson testified, substantially, as follows: "I am 88 years old. I have lived in Saunders county about 35 years. * * * We have lived on this farm over 20 years. My husband and I had four children, but they are all dead. My oldest daughter had one child, a boy, but he died when he was two months old. All my children have been dead many years. My oldest daughter's little boy died about 16 years ago. Anyway, Charlie Moline is my son. He was four years old when he came to us. He is married and has got six children. He has lived on this farm since he was four years old. He has been in this place always until now, and I hope he will stay here too. His mother was dead, and his father asked us to take him, and I say, 'Well, if I can be mother for him I will, I don't want to take him if I cannot be like a mother.' My husband, Mr. Carlson, was there and heard that talk, and he wanted to do that too; both of us wanted to take the boy. Mr. Carlson said: 'We'll do the best we can for the little child,' and Carlson said he wanted to take him for his son. He said he would take him for his boy, and we say: 'He shall come to us and stay with us forever, and afterwards he can attend to us while we be old,' and at that time it was said that all our property should belong to Charlie Moline after

we died. Then Charlie came to live with us, and we do all we can for him, and he do everything he could do to help us. We send him to school, and he done what he could, and as he grew older he act all right, he work on the farm, and he been all right. My husband and Charlie they talk about the farm many time after Charlie got older, and when Charlie was 16 years old Carlson promised him for sure that Charlie was to have the farm. They had a talk in our house when Charlie was about 16 years old, and then Carlson promised Charlie for sure that he would get the farm. When my husband told Charlie that Charlie should have the farm, I was willing. It was all right with me. I was willing then, and I am willing now, to let him have every bit. Of course, you know, I want my board so long I live. I do not know how long I live, and then it goes to him. No child could be a better child than Charlie have been to me. My husband tell Charlie many times that he should have the farm. I couldn't tell how many times he told him, but many, many times, and he never say anything different." On cross-examination she testified: "We send him to school and clothe him. He never needed a doctor for he hardly be sick. We gave him a little spending money, a little bit, a quarter of a dollar. We furnish him clothes and treat him kindly. Yes; Mr. Carlson and Charlie had some trouble. It was pretty hard to get along with Carlson. He was hard on me, I hate to talk about it. Sometimes Carlson and Charlie didn't get along well because Carlson was drunk, and then he hardly know what he do. Once Carlson was going to choke Charlie when he was drunk, and Charlie pushed him away. They quarrel two times. They weren't friendly towards each other. Once Charlie went to see his father. I tell him to go and see him. He stay about a week. Charlie and I were friendly; he called me 'mother.' Mr. Carlson and Charlie wasn't so friendly. Mr. Carlson was sorry when Charlie was away. He said: 'I be glad if Charlie come back.' Carlson scolded Charlie and he scold me, but when Charlie was away Carlson was so

angry. 'I wish Charlie come back, I wish he come,' he say.  *  *  *  Once Carlson and I went to Wahoo, and he made a will for Charlie; he had a will drawn, and he showed it to Charlie, and afterwards Charlie said, 'You better keep the will, papa, for maybe you take better care of it than I do.' He kept this will about a year. I don't know just how long, but a year, and then Carlson burnt the will up one time when he got drunk.  *  *  *  I knew that Carlson had a brother and had a sister, but she died and left two children. I don't know anything about them. I don't know if they live or not. Charlie don't know anything about them, and, he didn't know where they are. I never had anything to do with those people, never. Carlson used to write to them. 'He write a letter, and William hardly answer him, so he didn't get much love for him.' Carlson didn't write to his sister's daughter, he didn't know where she lived. He tried. to find out, but couldn't. Charlie comes to see me often; he come in the morning, and he come in the noon, and he come in the evening; he comes every day. Oh, he be so kind to me. I want him to have everything. We rented the farm to Charlie since he has grown up. He pays us $300 rent; he paid that always." Redirect. "Q. How did it happen, what made the bad feeling between Mr. Carlson and Charlie? A. The brandy. Q. And who used the brandy? A. Carlson; Charlie never, and that is why I love him for, for I hate brandy; I pour many tears for it. When I sign the paper in this case it was my free will. I hope and pray God you do the best you can for me and Charlie. You know what you done for Charlie you done for me and for his poor little children."

The witness A. F. Johnson testified, substantially: "I am 70 years old, and now live at Mead; have lived there about 6 years. Before that I lived on a farm 4 miles from Peter A. Carlson's farm. Carlson and I visited back and forth a good deal. I was well acquainted with Carlson; I knew him since we were 18 years old.  *  *  *  Mr. Carlson and I talked about his farm and about Charlie

Moline.  I remember that talk.  It is a pretty long time ago.  It must be 13 or 14 years ago.  The talk was right in his house.  He called me and my wife to come down there for dinner, and after dinner we go into the front room and sit down, and then he says to me, 'There is something I want to talk to you and let you know.'  'Well,' he say, 'my wife and I have agreed to promise Charlie Moline the farm and everything what we have after we is dead, and he have promised us to stay here and take care of us; he have done that before and he have promised to do that after this, so we want to make up a will for him;' and I say, 'Do you want to do that you might do that pretty quick;' and he say, 'Well, I want to talk about that before you so you know what we want to do.  I am outside a good many times, and I do not know what some can help me if I may die before we make up the will, so you hear that now, you can witness that.'  I remember this well.  I also remember that the boy was about four years old when he was taken into the Carlson home."

The witness Reim testified that he was the assessor.  "I called at Mr. Carlson's home to assess him; we talked about one thing and another, and he finally got to telling me that he received a letter from Charlie's father; that he wanted the boy back; and Carlson told me that he had made agreements now with Charlie and his father that if he stays until the old folks were dead that everything that was theirs, real and personal, was Charlie's."

The witness Baur testified that Carlson traded with him in his store; that on one occasion "we got to talking, and he told me his whole life story, how he had to go through life, and how he struggled; and, as he was coughing pretty heavy, I says, 'It's about time, old man, you prepare for death,' and one thing brought on another, and he said he has got it pretty nice and everything is all right, and I asked him who would get all the stuff he left behind, and he says, 'All is Charlie's, Charlie Moline;' he told me at one time that Charlie Moline took care of his things, and that in case something should happen that he gets his estate."

The witness Okeson testified that he had been acquainted with Carlson for 24 years; that he did work on Carlson's new house about 9 or 10 years ago; that, "while walking with Mr. Carlson on the road by his farm and near Frank Halsted's place—Mr. Halsted was married to Mr. Carlson's daughter at one time—I said to Mr. Carlson, 'Well, some times when you die Frank will come after some of your property,' and Mr. Carlson he said, 'No, everything that would be after me and my wife that will fall to Carl;' that is Carl Moline, the plaintiff; Mrs. Halsted, Carlson's daughter, had died long before that time, about 10 years before."

Five other witnesses testify to statements made by Carlson of quite similar import. It is also shown that, when plaintiff married, Carlson built a cottage on the farm, into which he and Mrs. Carlson moved, and in which they lived until the death of Mr. Carlson, and that plaintiff, with his wife, resided in the old house. Carlson and his wife retained about five acres for a garden, and plaintiff tilled the farm, paying Carlson $300 a year rent therefor. During all of the years that plaintiff worked upon the farm, up to the time of his marriage, he never received wages of any kind for his services. Every act and statement of Carlson's during the nearly 30 years of plaintiff's association with him, except the making of the last will, clearly indicate that the relations existing between him and his wife on the one side and plaintiff on the other were as claimed by plaintiff.

It is hard to see how a stronger case could be made in support of a parol agreement of the kind alleged in this case. To our minds the evidence is clear and satisfactory to the effect that Mr. and Mrs. Carlson made the agreement set out in plaintiff's petition, and that plaintiff fully performed his part of the contract. The fact that Mr. Carlson in his later years became addicted to the use of strong drink, and that while intoxicated he quarreled with the plaintiff, for no other reason, as appears from the record, except that plaintiff interfered in behalf of his

foster mother, affords no justification for a breach of the contract on the part of the deceased. Plaintiff was taken into their home when he was little more than a babe, under an assurance then made by the deceased and his wife that upon their death he should have all of their estate, and when, at the age of about 16 years, his father desired to have the boy return to him, the Carlsons again expressly agreed that, if he would remain with them until their death, he should have all of the estate. Acting under that agreement, plaintiff did not return to his father, but remained with the Carlsons and performed every duty faithfully and well. Upon this point there is no evidence to the contrary. We hold, therefore, that the contract alleged in the plaintiff's petition is fully proved.

That a parol contract of the kind set out in plaintiff's petition will be enforced where the making of the contract is sustained by clear and satisfactory proof is now so well settled in this state as to no longer require reference to our former decisions upon that point.

This brings us to the second point, viz.: "Was the land owned by Peter A. Carlson at all times his family homestead, and not subject to his individual disposal?" Upon this branch of the case counsel for defendants rely upon *Teske v. Dittberner*, 70 Neb. 544, and *Lichty v. Beale*, 75 Neb. 770. We do not think either of the cases cited is a bar to a recovery in this suit. *Lichty v. Beale* is not in point. In the *Dittberner* case the oral agreement was that the son Carl was to remain upon the particular premises in controversy, pay the taxes, keep up the place and improve it, and provide a home, board, clothing and spending money for the said Frederick Teske and his wife so long as they should live. If either the said Frederick Teske or his wife should desire to leave the home to be provided by plaintiff, then they were to receive $100 each per year in lieu of the above provisions relative to their support. In considering that contract, the court was of the opinion that it was governed by section 4, ch. 36, Comp. St. 1901, entitled "Homesteads." The difference between

that case and the one at bar is marked. The effect of the oral contract in that case was that the parents presently parted with the control of their homestead, and, instead of the son living with and serving and caring for them in their own home until their death, he was to provide a home for them; while in the case at bar no limitations whatever were put upon the right of Carlson and his wife to occupy, sell and convey, or encumber their homestead in any manner they saw fit. Their only contract was that, in consideration for the services rendered by plaintiff, he should have whatever estate remained after their death.

It will be seen, therefore, that this case does not come within the purview of section 4, *supra,* but that it is controlled by section 17, ch. 36, *supra,* which provides: "If the homestead was selected from the separate property of either husband or wife, it vests, on the death of the person from whose property it was selected, in the survivor for life, and afterwards in his or her heirs forever, subject to the power of the decedent to dispose of the same, except the life estate of the survivor, by will." In the light of this statute, there can be no doubt but that, if Carlson, at the time he made the oral contract relied upon, had executed his will, devising to plaintiff all of the estate, real and personal, of which he might die seized, subject to the life estate of his wife, the will would have been valid, and could not have been assailed by any one after his death. If he could have lawfully made a will thus disposing of his property, then he could lawfully contract to make such a will, and his heirs would have no more standing in court to plead the statute as to homesteads as a defense to an action to enforce the contract than they would have to plead the same statute if the suit were based upon such a will. By the parol contract, which we have already held is established by clear and satisfactory proof, Mr. Carlson did not attempt to convey or encumber his homestead, or to defeat his wife of her life estate as his surviving spouse, if she became such. He simply agreed to do that which the section of our statutes above

quoted shows he had a legal right to do; and, having executed a will leaving his estate to persons other than the plaintiff, he has broken his contract, and plaintiff is entitled to the relief prayed. In addition to all this, it appears from the record before us that at the time Carlson made the contract, and at the time of his death, there was no one dependent upon him for support, except his wife, who joined with him in the oral contract, and who now insists upon its performance. She was the only person, except Carlson himself, who had any right of homestead, and this right she has expressly waived and relinquished by her answer in this case.

The judgment of the district court is therefore reversed and the cause remanded, with directions to enter a decree quieting plaintiff's title in and to the lands in controversy, subject only to the debts, if any, of Peter A. Carlson and Eva Charlotta Carlson, and the costs of administration; the costs of the suit to be taxed against the defendants Ida Sofia Ahlen and Carl W. Carlson.

REVERSED.