ARTHUR ALLEN EVANS, APPELLEE, v. J. H: KELLY. ADMINISTRATOR, ET AL., APPELLANTS.

FILED JUNE 19, 1920.          No. 20812.

1. **Specific Performance:** AGREEMENT FOR ADOPTION AND INHERITANCE. A husband and wife, being childless, agreed to take and to adopt a boy of seven years under a promise that they would make a good home for him, and that he would be to them "just the same

Evans v. Kelly.

as an own son," and that "he would inherit their wealth' at their death." So long as the husband and wife lived, the surviving husband having died when the foster son was thirty, they spoke of and treated him in all respects as parents would a son, he having industriously and faithfully served them during that period in all respects as a dutiful and obedient son. Both husband and wife died intestate and without fulfilling the adoption agreement. *Held* that, under the facts discussed in the opinion, such foster child, plaintiff herein, is entitled to specific performance.

2. **Evidence:** DECLARATIONS AGAINST INTEREST. It is fundamental that declarations against interest cannot ordinarily be annulled or explained away by counter declarations.

3. **Specific Performance:** PAROL CONTRACT. "Specific performance of a parol contract will be enforced by a court of equity, where one party has wholly and the other partly performed it, and its nonfulfilment on the one hand would amount to a fraud on the party who has fully performed it." *Kofka v. Rosicky*, 41 Neb. 328.

4. ———: DISCRETION OF COURT. "Specific performance is a matter of discretion in a court, which withholds or grants relief according to the circumstances of each particular case, where the general rules and principles governing the court do not furnish any exact measure of justice between the parties." *Kofka v. Rosicky*, 41 Neb. 328.

5. **Evidence:** DECLARATION AGAINST INTEREST. A foster father was appointed by the county court guardian of his minor foster son to collect an inheritance of $380. *Held*, that an averment by the ward, made in that proceeding soon after he became 21, with respect to having received payment for "work and labor," bore no relation either to the guardianship proceeding or to the issues in the present case, it clearly appearing that the petition for appointment and the decree discharging the guardian, when his trust was fulfilled, had to do solely with the collection of and the payment to the ward of the $380 in question, and it being clearly established in the present case that the ward never received any wages or remuneration from the guardian for work and labor.

APPEAL from the district court for Dawson county: HANSON M. GRIMES, JUDGE. *Affirmed in part and reversed in part.*

*Richard S. Horton, E. A. Cook, W. M. Cook, H. M. Sinclair, H. Francisco* and *W. A. Stewart,* for appellants.

*Hainer, Craft & Edgerton* and *T. M. Hewitt, contra.*

DEAN, J.

This is an action against the estate of Peter Ham-
mond, deceased, to compel specific performance of a
contract alleged to have been made in 1894 between
plaintiff's legally appointed guardian, of the one part,
and Hammond's wife, of the other part. It is pleaded
that Mr. Hammond subsequently ratified the contract.
Mrs. Hammond died in 1903. Her husband died in
1917. The Hammonds were childless and both died in-
testate. It is alleged that by the terms of the contract
the Hammonds, not only agreed to legally adopt
plaintiff, but they also agreed to make him "heir
to their property as a son of their own blood." The
brothers and sisters of Hammond and two nephews,
in all seven relatives, and Susan R. Hearle, who claimed
to be a common-law wife of Hammond, were made par-
ties defendant. The court awarded specific performance
of the contract as prayed by plaintiff and rendered judg-
ment against the claim of Mrs. Hearle. All defendants
appealed.

Plaintiff was born August 9, 1887. His parents died
when he was about two years old. He was then taken
to the home of his grandmother Mercer, who became
his guardian, and was then living with her second
husband, who is known in the record as plaintiff's
"step-grandfather." He remained in the Mercer
home until his grandmother died in June, 1894. A
few days thereafter plaintiff, as alleged, was taken to
the Hammond home by Mr. Mercer and left there
pursuant to the agreement made about ten days before
between Mrs. Mercer and Mrs. Hammond.

Plaintiff contends, and there is testimony tending to
prove, that the contract for the relinquishment of
plaintiff by Mrs. Mercer was in writing, and that she
signed it in her own home, a few days before she died,
in the presence of Mrs. Hammond and three or four
others. Mrs. Hammond retained possession of the con-
tract at the time, but subsequently it was lost. It

does not, however, appear that it was signed by either of the Hammonds.

Ten or more disinterested witnesses testified on the part of plaintiff in respect to the contract sued on and as to the relations between the parties. Before Mrs. Mercer signed the "adoption paper" two or more conferences were had between her and Mrs. Hammond. Mrs. Small was at the Mercer home on one occasion when the subject was talked about between Mrs. Mercer and Mrs. Hammond. She testified that Mrs. Hammond said they would "make the boy a good home and he should be just the same as an own son," and that "he would inherit their wealth at their death." Another witness corroborated this, and in addition testified, as did other witnesses, that Mrs. Hammond said she did not want plaintiff's relatives to visit him at her home lest he become homesick and be enticed to return to his people. She testified that Mrs. Hammond said: "When he is 21 years of age he shall have his name back, Arthur Evans." Another, who was present and saw Mrs. Mercer sign the relinquishment, testified that when the doctor handed it to her he remarked to Mrs. Mercer that this is what "they agreed to sign for this little boy to give away." Three or four witnesses testified that they were present and saw Mrs. Mercer sign the instrument, and two or more besides the doctor heard it referred to at the time by the parties as "an adoption paper."

Ten or more witnesses testified in regard to declarations and statements made by Mr. Hammond against interest that covered a series of more than 20 years. One testified that some time after plaintiff was brought put down a well on the farm for Mr. Hammond about to his new home he heard Mr. Hammond say to a neighbor, "We will take care of the boy and he will be our boy," that the Hammonds taught the boy to call them "papa and mamma," and that Mr. Hammond said that Arthur "will have what we have got." To an-

other he referred to plaintiff as "the little boy Mrs Hammond and I have adopted." To a witness, who put down a well on the farm for Mr. Hammond about four years before he died, he said, "You will board at my home there with my son, my adopted son, Evans." The then county judge testified that Mr. Hammond on two different occasions told him that he was going to legally adopt plaintiff; that in 1898, when the guardianship proceedings were pending that will presently be noted, Mr. Hammond inquired about the cost of taking out adoption papers, and at that time, plaintiff then being eleven, told him that he would adopt Arthur "later on, when I get around to it."

When plaintiff was 17 he was treated for appendicitis. Upon paying the doctor Mr. Hammond spoke of Arthur as his adopted son, and seemed to express the solicitude of a father for his welfare. A few years afterward he suffered another attack and was again treated, this time by a physician at Omaha; Mr. Hammond having learned of his condition and having sent for him to come to Omaha for that purpose. This bill was also paid by Mr. Hammond.

Business men, farmer neighbors, the Hammond family physician, the physician's wife, and the minister who preached at the home church, all testified that Mr. Hammond throughout the years, and with more or less frequency, not only referred to plaintiff as his adopted son, but treated him in all respects as a son. He referred to himself as "grandpa," when in playful mood he would talk to plaintiff's infant child. Plaintiff was known in the home neighborhood as Arthur Hammond until he reached manhood, and it appears that many persons believed him to be a son of the Hammonds. For some time after his majority he retained the name of Hammond and kept a bank account in that name; the bank book being issued to him in the name of Arthur Hammond by Mr. Kelly, then a banker, and now administrator of the Hammond estate. A check

is in evidence, dated July 3, 1909, written by Peter Hammond, payable to Arthur Hammond's order, and indorsed by plaintiff in that name when it was cashed. In the Sunday school record his name appeared as Arthur Hammond, and by that name he was baptized into the communion of the church. An infant child of the Evans family was buried in the Hammond family lot in the cemetery.

Early in 1910 Peter Hammond moved from the farm to Gothenburg. Soon afterward he moved to Omaha, where he resided four or five years. From Omaha he returned to Gothenburg, and there he made his home until he died in 1917. During this seven-year period, plaintiff, having married in the meantime, was left in sole possession and charge of the farm and personal property owned by Mr. Hammond, apparently in all respects as though he had been a son, and he was in possession when this suit was tried. While Mr. Hammond lived, plaintiff had charge of his business affairs and of his range lands, collecting the farm rentals and the like. He painted his foster father's Gothenburg house, put in the chandeliers, and changed the doors at his request, and built for him a chicken house. He did his plumbing and car-repairing and accompanied him on drives when requested. All of these and other like services were rendered by him in all respects as a son would serve a father, and it does not appear that plaintiff received any remuneration for any of the services so rendered. When Mr. Hammond lived at Omaha he frequently requested plaintiff to visit him there. At such times he stayed at the Hammond home from two days to two weeks, as occasion might require. Besides taking up business matters pertaining to the farm, he performed services for Mr. Hammond in his Omaha home similar to those performed for him in the home at Gothenburg. Mrs. Evans' testimony corroborated that of the other witnesses called by plaintiff respecting the apparent father and son relation between

Mr. Hammond and her husband and the work that he performed for him. Mr. Hammond died suddenly at Omaha. Plaintiff was notified of his death, and brought his remains home for burial in Dawson county.

That Mrs. Mercer voluntarily relinquished all right to the lawful custody of and power and control over plaintiff, as his guardian, to the end that he should be fully adopted by the Hammonds, as provided by the law then in force (Ann. St. 1893, sec. 5263) ; and that the Hammonds agreed so to adopt plaintiff and make him their heir seems to be established. It seems clear, too, that the relation between the Hammonds and plaintiff, and their demeanor toward and their treatment each of the other, was that of parent and child from the time that he entered their home in his infancy until he was 30, when Mr. Hammond died. The contract in the present case appears to be sufficiently definite in its terms, and the relation between the Hammonds and plaintiff seems to be referable solely to the contract as made. That its conditions were substantially performed by plaintiff is clearly established. It is not unreasonable to believe that the Hammonds would be desirous of adopting a likely boy to take the place of a son in their childless home, that he might be to them an aid and comfort in their middle age and in their declining years.

Defendants argue that the contract sued on is void under the statute of frauds. Section 2626, Rev. St. 1913, being a part of the fraud statute, provides: "Nothing in this chapter contained shall be construed to abridge the powers of the court of equity to compel the specific performance of agreements in cases of part performance."

Section 2626 seems to be applicable to the facts before us. Mr. Hammond having died without fulfilling his part of the contract, and plaintiff having wholly performed his part, and it appearing that its nonfulfilment would amount to a fraud as against him, it follows

that under the rule announced in *Kofka v. Rosicky*, 41 Neb. 328, 25 L. R. A. 207, 43 Am. St. Rep. 685, specific performance of the contract should be enforced by a court of equity. The *Kofka* case has been followed and affirmed in numerous decisions of this court, and recently in *Moline v. Carlson*, 92 Neb. 419; *Parks v. Burney*, 103 Neb. 572.

On the part of defendants some testimony was offered tending to prove that Mr. Hammond made statements respecting his relations with plaintiff that were inconsistent with his alleged statements of an intention to make him his heir, and there was some testimony by persons residing in the vicinity to the effect that they never heard him say that it was his intention to adopt plaintiff or to give him any property. Admissions or declarations against interest are ordinarily conclusive as against the party making them and cannot be annulled or explained away by counter declarations. *Harrison v. Harrison*, 80 Neb. 103. The rule seems to be applicable in the present case.

The defendant heirs contend that plaintiff by his own averment in a certain guardianship proceeding waived his right to claim any part of the estate. While he was yet a minor, plaintiff inherited $380 from the estate of a relative. To obtain the money it was necessary that he have a guardian. Naturally Peter Hammond was appointed. Among the gaurdianship papers that are in evidence there is an instrument signed by plaintiff and acknowledged December 1, 1908, before Mr. W. A. Stewart as notary public. Among other things it contains an averment of payment by the guardian of the money that came into his hands as guardian, and payment "for all money due me for work and labor done by me for him during my minority." Defendants argue that this is inconsistent with plaintiff's claim. When the instrument in question is considered in connection with the evidence in this case and in connection with the guardianship proceeding that

had to do solely with the collection of $380 from an estate, any statement or averment therein respecting payment for work and labor apparently bears no relation to the subject-matter. This is borne out by the petition for the appointment of Mr. Hammond as guardian and the decree of the county court discharging him from his trust, both petition and decree having to do solely with the $380 that came into Hammond's hands as guardian and the payment of that sum to plaintiff. Plaintiff testified that he never received any wages from Mr. Hammond, and that he never gave him anything except a colt. His testimony in this respect is undisputed. The statement relied on by defendants finds support neither in the petition nor in the decree of the county court, nor elsewhere in the record.

The Hammond heirs pleaded an alleged contract that purports to be a compromise settlement with them. In addition to the names of the heirs, the names of plaintiff and of the defendant Susan R. Hearle, and one other who made a claim for services, but who is now making no claim, were appended to the alleged contract by W. A. Stewart, now one of the attorneys in the case for parties other than plaintiff. Mr. Stewart testified that he had authority to make the proposed settlement and to affix the name of plaintiff to the contract. This the plaintiff denied. The instrument bears date of August 15, 1917. Plaintiff not only denied that he authorized the signing of his name, but he testified that the alleged contract was not made with his approval. That he did not ratify the contract sufficiently appears. It also appears that it was repudiated by both of the other parties whom Mr. Stewart also claimed to then represent. Mr. Stewart admitted that he never showed the contract to plaintiff, and plaintiff testified that he did not even tell him about it. Mr. Stewart further testified that plaintiff told him "that he thought he had been adopted;" that "we searched for the adoption papers here and found nothing except the guardianship

Evans v. Kelly.

papers;" and that "finally I told him I was going to St. Louis on some business and would take this matter up with the folks in Indiana," meaning the defendant heirs.

Plaintiff testified that he employed Mr. Stewart as attorney in the probate of the Hammond estate; that he prepared the petition for the appointment of an administrator and that he acknowledged it before him; that Mr. Stewart told him the Hammond heirs had written to him about getting a settlement, and had asked him to meet them at St. Louis, and that later "he had to go on up to Madison to meet them there." He testified that he did not send Mr. Stewart to see the Hammond heirs, nor did he authorize him to make a settlement with them. He said he paid Mr. Stewart $50 for expense money because Mr. Stewart asked him for it. The record, considered in its entirety, convinces us that Mr. Stewart must be mistaken in his expressed belief that plaintiff authorized him to execute the contract or to effect a settlement. We conclude that plaintiff is not bound by the contract in question.

One other point must be mentioned in respect of the claim of Mrs. Hearle. The decree not only adjudges specific performance, but it is adjudged that plaintiff is the sole and only legal heir to all the property left by Peter S. Hammond, deceased. The county court has sole original jurisdiction to determine the question of heirship in proceedings to settle the estate of deceased persons. Such proceedings in the Hammond estate are still pending. This is an original action in the district court. That court therefore had no jurisdiction to determine this question originally. This portion of the decree must be set aside. In all other respects the judgment is affirmed.

JUDGMENT ACCORDINGLY.

LETTON, DAY and FLANSBURG, JJ., not sitting.